57 A.3d 582

Richard SCAMPONE, as Executor of the Estate
of Madeline Scampone, Appellee

v.

HIGHLAND PARK CARE CENTER, LLC, d/b/a Highland Park
Care Center, Grane Healthcare Company, Grane Associates,
L.P., Trebro, Inc., Appellants.

Richard Scampone, as Executor of the Estate
of Madeline Scampone, Appellee

v.

Highland Park Care Center, LLC, d/b/a Highland Park
Care Center, Grane Healthcare Company, Grane
Associates, L.P., Trebro, Inc., Appellants.

Supreme Court of Pennsylvania.

Argued Nov. 30, 2011.

Decided Nov. 21, 2012.

Stephen Trzcinski, Esq., Philadelphia, Peter D. Giglione, Esq., Pittsburgh, of Wilkes & McHugh, P.A., Noah I. Axler, Esq., Kelly Bagby, Esq., Steven M. Barth, Esq., of Goodrich & Goodrich, P.C., David C. Harrison, Esq., Philadelphia, on behalf of the plaintiff/appellee (Scampone).

John A. Bass, Esq., Pittsburgh, of Grogan Graffam, P.C., Russel D. Giancola, Esq., Pittsburgh, Alan S. Gold, Esq., Elkins Park, of Gold & Ferrante, PC, Miles A. Kirshner, Esq., Pittsburgh, Marc A. Moyer, Esq., Harrisburg, Stuart T. O'Neal III, Esq., Marc L. Penchansky, of McCumber, Daniels, Buntz, Hartig & Puig, P.A., Ira L. Podheiser, Esq., Pittsburgh, of Burns, White & Hickton, L.L.C., represented the defendants/appellants (Grane Healthcare and Highland Park).

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Chief Justice CASTILLE.

Highland Park Care Center, L.L.C. and Grane Healthcare Company (separately, "Highland Park" and "Grane Healthcare"; together, "appellants") appeal the decision of the Superior Court to reverse the grant of a nonsuit in part, affirm the denial of a nonsuit in part, and award a new trial to Richard Scampone, the executor of the estate of Madeline Scampone (the "Scampone estate" or "appellee"). We hold that a nursing home and affiliated entities are subject to potential direct liability for negligence, where the requisite resident-entity relationship exists to establish that the entity owes the resident a duty of care, as we explain *infra*. Accordingly, we affirm the Superior Court in part, upon reasoning different

from that articulated by the Superior Court, and we remand to the trial court for proceedings consistent with this Opinion.

## I. *Background*

Ms. Madeline Scampone resided at Highland Park, a nursing home in Pittsburgh, Pennsylvania, from 1998 to 2004. She received skilled nursing care for a number of chronic ailments, including senile dementia, osteoporosis, pulmonary disease, and hypertension. Ms. Scampone was also susceptible to developing urinary tract infections; indeed, she was hospitalized repeatedly upon such diagnosis in June 2002, July 2003, October 2003, and December 2003. During her 2003 hospitalizations, staff also noted a degradation in Ms. Scampone's mental status. Following admission in December 2003, Ms. Scampone remained hospitalized for three days, after which she returned to Highland Park in good condition. On January 30, 2004, however, the hospital re-admitted Ms. Scampone, diagnosing her with yet another urinary tract infection, dehydration, malnutrition, bedsores, and an acute myocardial infarction. On February 9, 2004, Ms. Scampone died of a heart attack at the age of 94. Following his mother's death, Richard Scampone was appointed executor of her estate.

In 2005, Mr. Scampone filed in the Allegheny County Court of Common Pleas an action on behalf of the Scampone estate against Highland Park, a corporation; against Grane Healthcare, a corporation providing management services to Highland Park; and against Grane Associates L.P., Trebro Inc., and Ross J. Ness, parties with direct or indirect ownership interests in Highland Park.[1] In the complaint, the Scampone estate asserted claims of negligence under the Survival Act and of wrongful death, and requested compensatory and punitive damages, costs of litigation, and other relief that the court could find proper. Appellee proceeded on theories of (1) corporate negligence, or appellants' direct liability, and (2)

1. The parties dismissed Ross J. Ness from the suit by stipulation in March 2006. Moreover, on May 24, 2007, the trial court granted motions for nonsuit on all claims against Grane Associates L.P. and Trebro Inc.; there is no challenge to the propriety of the trial court's decision with respect to these entities.

appellants' vicarious liability for the negligent acts of their employees and other agents. The matter went to trial on May 14, 2007, before the Honorable Robert J. Colville.

At trial, the Scampone estate offered evidence—primarily testimony of nurses and certified nursing assistants, former Highland Park employees—regarding the care provided to Ms. Scampone during the period leading up to the end of her stay at the nursing home and subsequent death. These former employees testified that they often lacked time to accomplish the tasks assigned to them in the care plans of all residents, including distributing water, and tracking with regularity the daily activities, food and water intake, output, and medications provided to Ms. Scampone. Moreover, witnesses stated that staff at Highland Park failed to inform Ms. Scampone's doctors and family of changes in her condition, and failed to follow doctors' orders regarding obtaining samples and performing tests on Ms. Scampone to determine whether she had an infection. The former caretakers for Ms. Scampone testified to their observations that the limited personnel available could not accomplish all tasks required by Ms. Scampone's care plan, and stated that they informed Highland Park and Grane Healthcare supervisors and administrators of the shortfall in care and its causes. The Scampone estate also introduced evidence regarding the relationship between Highland Park and Grane Healthcare; the degrees of direct healthcare provided to residents and of control exercised over daily operations at the nursing home by each appellant's employees; and the decision-making process and authority invested in various employees and officers of Highland Park and Grane Healthcare, respectively, over budgetary and personnel matters.

Finally, appellee elicited expert testimony regarding the applicable standard of care and causation. The Scampone estate's nursing expert concluded that the failures to provide sufficient water and medication, to track the daily activities and report changes in condition, and to follow doctors' directions breached the standard of care for a skilled nursing facility. Additionally, a medical expert testified that appel-

lants' breach of the standard of care, as described by the former employees and the nursing expert, caused dehydration and permitted Ms. Scampone's urinary tract infection to progress, affecting her heart and leading up to her acute myocardial infarction and related death.

On May 24, 2007, after the Scampone estate concluded its case, appellants moved for a nonsuit on all claims against Grane Healthcare, as well as for a nonsuit limited to the claims of corporate negligence and for punitive damages against Highland Park. *See* Notes of Testimony ("N.T."), 5/24/2007, at 683–84. Following briefing and argument, the trial court granted appellants' motion, except for the request to dismiss appellee's claim of corporate negligence against Highland Park. N.T., 5/25/2007, at 12–14. Highland Park, as the only defendant remaining in the case, proceeded to offer evidence in its defense.

Highland Park elicited testimony from its current and former employees regarding the daily care afforded Ms. Scampone and their observations regarding the level of staffing at the nursing home. According to the testimony, Highland Park had sufficient staff to meet state and federal requirements, as well as patient needs. Moreover, Highland Park offered evidence that, although record keeping was admittedly poor, Ms. Scampone received the requisite care. Highland Park sought to show that complaints of former employees regarding understaffing were unfounded or based on the perception and unjustified expectations of those witnesses, rather than on the actual requirements of appropriate care.

Highland Park also offered expert opinion on whether the care provided to Ms. Scampone met the standard for a skilled nursing facility; the expert testified that Ms. Scampone's overall well-being and longevity exceeded expected outcomes given her age and degraded health upon admission, and was evidence that Highland Park met the requisite standard of care. Finally, Highland Park concluded with testimony from its medical expert, which challenged appellee's theory of causation. The medical expert offered his opinion that Ms. Scampone's decline, inability and/or unwillingness to take in

food and water, and Ms. Scampone's subsequent death were caused by a stroke detected after her admission into the hospital. The expert described a rapid "cascading" effect, commonly encountered in geriatric patients like Ms. Scampone, whose cause could not be attributed to any acts or omissions of Highland Park or its employees. The trial court denied the Scampone estate's request to offer rebuttal testimony.

On May 31, 2007, the trial court charged the jury, *inter alia,* with respect to the Scampone estate's theories of direct and vicarious liability. N.T., 5/31/2007, at 161–67. The court then recessed for jury deliberations. On June 1, 2007, the jury returned a verdict in favor of the Scampone estate, finding Highland Park directly and vicariously liable for negligence. The jury awarded appellee compensatory damages in the amount of $193,500. The parties filed cross-motions for post-verdict relief, which the trial court denied in October 2007. On November 8, 2007, the trial court entered a judgment on the verdict plus costs, which both parties appealed timely to the Superior Court.

The trial court ordered both parties to file statements of matters complained of on appeal. *See* Pa.R.A.P. 1925(b). The parties complied. In its Rule 1925(b) statement, the Scampone estate alleged, *inter alia,* that its evidence was sufficient to state claims of direct and vicarious liability against Grane Healthcare, and for punitive damages against both Grane Healthcare and Highland Park; appellee challenged the trial court's decision to grant appellants' nonsuit motion in these respects. Highland Park, in its separate Rule 1925(b) statement, challenged the judgment on the ground that the trial court erred in allowing the Scampone estate's corporate negligence claim against Highland Park to proceed to the jury. Among other theories, Highland Park argued that a nursing home, unlike a hospital or a health maintenance organization ("HMO"), is not exposed to direct liability under the corporate negligence theory recognized by Pennsylvania courts. On February 8, 2008, the trial court filed its Rule 1925(a) opinion, explaining the bases of its various decisions.

On appeal, the Superior Court panel affirmed in part, holding that the trial court properly allowed the claim of corporate liability as to Highland Park to go to the jury. But, the panel otherwise reversed, based on the conclusion that the trial court improperly granted appellants' motion for nonsuit because the Scampone estate had offered sufficient evidence with respect to corporate negligence (as to Grane Healthcare) and with respect to punitive damages (as to both appellants) to warrant submission of these issues to the jury. The panel remanded the matter to the trial court for a new trial, and dismissed as moot any remaining issues of which the parties complained on appeal. *See Scampone v. Highland Park Care Ctr.*, 11 A.3d 967 (Pa.Super.2010). Grane Healthcare and Highland Park filed petitions for allowance of appeal, which we granted. The issue accepted for appeal, as rephrased by the Court, is:

> Whether the Superior Court erred in applying the corporate negligence theory, initially adopted by this Court in *Thompson v. Nason Hospital* [527 Pa. 330], 591 A.2d 703 (Pa.1991), to a skilled nursing facility and the healthcare company responsible for its operations?

*Scampone v. Highland Park Care Ctr.*, 609 Pa. 264, 15 A.3d 427 (2011) (*per curiam*). The parties filed timely briefs with the Court.[2]

## II. Arguments

Appellants argue that the Superior Court erred in remanding the case to the trial court for a new trial because corporate negligence is not a viable cause of action against either a skilled nursing facility or the company which provides management services to the facility. According to appellants, this Court has limited corporate liability for negligent conduct to

---

**2.** In addition, several advocacy groups filed *amicus curiae* briefs. The following groups offered arguments in support of appellants: Pennsylvania Health Care Association, Center for Assisted Living Management, Pennsylvania Association for Non–Profit Homes for the Aging, American Health Care Association, The Pennsylvania Golden Living Centers, HRC Manorcare and HCF, Inc., Complete Healthcare Resources— Eastern, Inc., and the Pennsylvania Defense Institute. The Pennsylvania Association for Justice filed a brief in support of appellee.

hospitals, on the principle that the "corporate hospital today" is "a comprehensive health center with responsibility for arranging and coordinating the total healthcare of its patients." Appellants' Brief at 17 (quoting *Thompson*, 591 A.2d at 706). In *Thompson*, appellants state, this Court addressed only the question of a hospital's liability and did not portend to articulate a doctrine of corporate negligence applicable to all other types of healthcare corporations. Indeed, according to appellants, in two matters decided after *Thompson*, the Court analyzed corporate liability only as applied to hospitals. *Id.* at 18 (citing *Welsh v. Bulger*, 548 Pa. 504, 698 A.2d 581 (1997) (plaintiff must present expert testimony in order to establish *prima facie* case of negligence against hospital, unless negligence is obvious) and *Moser v. Heistand & Ashland St. Gen. Hosp.*, 545 Pa. 554, 681 A.2d 1322 (1996) (state-owned medical facility has sovereign immunity from claims of corporate negligence)). Appellants further note that federal courts have recognized this Court's supposed "desire" to limit the application of corporate liability to hospitals. *Id.* (citing, *inter alia*, *Milan v. Am. Vision Ctr.*, 34 F.Supp.2d 279 (E.D.Pa.1998)).

Moreover, appellants argue that the Court has correctly limited liability to hospitals, and claim that extending the doctrine of corporate negligence to any other type of healthcare entity is problematic. Appellants identify several "policy" reasons in support of their argument. First, according to appellants, developing a test for identifying healthcare corporations to which the doctrine should apply is impossible and unworkable; an added difficulty is to re-define hospitals' duties under *Thompson* in a manner that applies to all healthcare corporations. Limiting the doctrine of corporate liability to hospitals, appellants claim, has the advantage of simplicity. Second, appellants posit that a cause of action for corporate negligence is superfluous, because patients can be made whole via vicarious liability claims. Third, appellants argue that the extension of liability will increase operational expenses, discouraging healthcare corporations from providing affordable, or even any, services in the Commonwealth. Such corporations, according to appellants, will be exposed to additional

liability, including for punitive damages; will be forced to obtain medical malpractice insurance, where now they rely on medical professionals to carry policies; and will generally suffer increased uncertainties and complexities in litigation, and decreased incentives for settlement.

With respect to the development of a test for determining what types of healthcare corporations may be held liable for corporate negligence, appellants structure their argument on the assumption that some types of healthcare corporations are exempt from liability. Thus, appellants state that, after *Thompson*, the first extension of the doctrine was to an HMO, which was like a hospital because the HMO "actually provided health care to its subscribers." Appellants' Brief at 23 (citing *Shannon v. McNulty*, 718 A.2d 828 (Pa.Super.1998) (HMO may be held liable for corporate negligence)). Appellants distinguish *Shannon*, contending that the Superior Court's considerations are inapplicable to a skilled nursing facility. Appellants represent that nursing home staffs simply carry out orders of physicians without the ability to challenge them, and skilled nursing facilities like Highland Park do not employ physicians and do not have an administrative staff to which to report failures of physicians. Accordingly, appellants state, holding a skilled nursing facility liable for acts or omissions which commonly occur in a hospital but not in the nursing facility is inappropriate. Appellants' Brief at 25 (citing *Sutherland v. Monongahela Valley Hosp.*, 856 A.2d 55 (Pa.Super.2004) (no viable corporate negligence claim against physician's office which, unlike hospital, does not assume role of comprehensive health center)).

Concomitantly, appellants criticize the *Shannon* decision, which they say "has become the beacon for trial courts and the Superior Court" on the issue of which entities are subject to the corporate negligence doctrine, on the ground that it is unworkable. *Id.*[3] According to appellants, the test applied by

3. Similarly, appellants reject several trial court decisions to permit corporate negligence claims to proceed. Appellants' Brief at 36–39 (citing *Stewart v. GGNSC–Canonsburg, L.P.*, 2010 WL 5834286, 2010 Pa. D & C LEXIS 155 (Wash.Cnty.C.C.P.2010), *aff'd* 9 A.3d 215 (Pa.Su-

Pennsylvania lower courts following *Shannon* is whether a particular type of healthcare corporation resembles either a hospital or an HMO rather than a physician's office: "if [a healthcare corporation] is 1 % or more like an HMO or a hospital, corporate negligence applies ... [and i]f it is 1 % or more like a physician's office, it does not apply." Appellants' Brief at 27. Moreover, appellants state that the *Shannon* standard of reasonable care is not grounded in any "cogent policy considerations" and "essentially renders healthcare corporations liable for the general malpractice of their employees and independent contractors," and "duplicates vicarious liability." *Id.* at 24 (citing *Sutherland, supra*) (no corporate negligence liability for physician's office). Appellants note that other courts have proceeded even farther afield from this Court's *Thompson* test and have looked to whether a patient "forfeit[s] legally or practically the ability to turn elsewhere for medical care," whether a patient had to commit to a single provider for comprehensive care, or whether the provider delivered care or simply functioned as a gateway for entry into the healthcare system via referrals. *Id.* at 29–30. Appellants argue that the Court should avoid the difficulty of developing a test for determining the applicability of corporate negligence theory by holding that it only applies to hospitals.

In the alternative, appellants submit that "[t]he test that should be adopted is whether the healthcare corporation is like a hospital as to its comprehensiveness of care." *Id.* at 32. Application of appellants' proposed test would exempt nursing homes from corporate liability. Specifically, appellants offer that Highland Park does not provide extensive medical care but simply aids residents in performing daily activities (such as eating, dressing, bathing, walking, and transferring into bed) or acts as a "gateway into the healthcare system." When necessary, residents employ their own physicians and may be admitted to hospitals. Accordingly, appellants assert that a nursing home cannot be found to owe any "non-delegable

per.2010); *Capriotti v. Beverly Enters. Pa.,* 72 Pa.D & C.4th 564 (Fayette Co.C.C.P.2004); *Frantz v. HCR Manor Care, Inc.,* 64 Pa.D & C.4th 457 (Schuylkill Co.C.C.P.2003)).

duty" directly to its residents. Appellants' Brief at 32–34. Appellants highlight the General Assembly's definitions of "nursing home" and "hospital" to confirm the distinction and as a guidepost for determining whether a type of healthcare entity functions as a hospital. *Id.* at 34 (citing 62 P.S. § 1001; 28 Pa.Code § 101.4). For appellants, any conclusion that a skilled nursing facility functions as a hospital would undercut the Commonwealth's administrative system, for example, with respect to a patient's right to choose a physician. *Id.* at 36 (citing 42 U.S.C. § 1395(a) (concerning Medicare beneficiaries)).

Appellants also suggest that articulating duties of healthcare corporations to address the variety of such types of entities is difficult and will necessitate adjustment of *Thompson.* As an example, appellants cite *Thompson*-derived duties to select, retain, and oversee competent physicians, and to formulate and enforce policies regarding physicians—functions which, appellants indicate, a nursing home has no ability to perform. Accordingly, appellants offer, "it makes no sense to expand corporate negligence to nursing homes," as almost all resident care other than that relating to the functions of daily living, are outside the control of the skilled nursing facility. Appellants warn that modifications of *Thompson* in the lower courts have "brought to pass [former] Justice Flaherty's prediction" that the decision will be extended beyond its limited application to hospitals, and insist that this Court should retrench to its prior limited holding. Appellants' Brief at 39 (citing *Thompson,* 591 A.2d at 709 (Flaherty, J., dissenting)).

Finally, appellants reassert their prior arguments to challenge the Superior Court's decision with respect to Grane Healthcare's liability for corporate negligence. Appellants describe the services provided by Grane Healthcare to include: periodic visits from nursing consultants, in-house training of nursing and administrative staff, assistance with regulatory compliance and purchases of supplies, accounting and budgeting services, and assistance in formulating policies and procedures. Relying primarily on a federal district court decision, appellants argue that an independent contractor providing

management services does not assume a role of providing comprehensive healthcare or of arranging and coordinating the total care of patients. *Id.* at 40 (citing *Drumm v. Schell,* 2008 WL 1944152, 2008 U.S. Dist. LEXIS 36578 (M.D.Pa. 2008)). Because Grane Healthcare provides administrative rather than medical services, that entity does not function as a hospital and, therefore, appellants argue, should not be exposed to corporate negligence liability. Appellants' Brief at 41–42.

In response, appellee Scampone estate offers a broader interpretation of the *Thompson* decision.[4] Appellee argues that any corporation may be held directly liable for acts of negligence, independent of its servants' liability. This general theory of liability, appellee claims, applies to any type of healthcare corporation and the *Thompson* decision did not purport to immunize such entities for their negligent conduct.

Appellee states that the *Thompson* Court was simply "continu[ing] a trend of extending the general rule of corporate negligence to hospitals, which had [in the past] enjoyed charitable immunity from tort liability." Appellee's Brief at 45–46 (citing *Thompson,* 591 A.2d at 706; *Flagiello v. Pa. Hosp.,* 417

---

**4.** Appellee expends a great deal of resources describing the evidence introduced at trial, purportedly to correct appellants' misrepresentations. *See* Appellee's Brief at 7–43 ("Concise Counter-statement of the Case"). Appellee requests that we dismiss appellants' "[p]etition" and "supporting [b]rief," if "this Court was misled as to the true nature of this case" by appellants' unsupported allegations regarding the record. *Id.* at 45 (citing *Lal v. Commonwealth,* 755 A.2d 48 (Pa.Cmwlth.2000); Pa.R.A.P. 1115(d)).

Appellee's dismissal request is denied. Moreover, given the procedural posture of this matter, we do not address the evidence of record at any length, except to provide background for our decision. Here, the trial court granted Grane Healthcare summary relief at the close of appellee's case, and the issue of Grane's corporate negligence did not reach the jury. The Superior Court reversed and granted appellee a new trial. We accepted review in this matter on the single issue of whether a skilled nursing facility resident may have a valid claim, as a matter of law, for corporate negligence against the facility and affiliated entities. We do not purport to decide whether the evidence was sufficient to establish appellee's corporate negligence claims in the first trial, nor to predict whether any evidence that appellee may offer will be sufficient to prove such claims upon remand. Rather, our decision is limited to the narrow issue of law upon which we granted review.

Pa. 486, 208 A.2d 193 (1965) (abolishing immunity of charities)). Thus, in cases following *Flagiello*, the Court recognized claims based upon theories of *respondeat superior* and ostensible agency, and finally of corporate negligence, against hospitals. Early cases, appellee notes, involved departures from accepted medical practice but, in *Thompson*, the breach implicated the corporate hospital's failure to supervise doctors' rendering of care and to enforce hospital policies regarding specialist consults. Appellee argues that the circumstances called for the *Thompson* Court to recognize a hospital's non-delegable duties to the patient as independent duties from those of individual medical professionals. Appellee's Brief at 47 (citing *Thompson*, 591 A.2d at 707). Furthermore, in *Welsh*, the Court offered additional guidance on the corporate negligence theory, by holding that allegations regarding the failure of nurses to report vital changes in a patient's condition and to take appropriate action are sufficient to state a *prima facie* case for a direct liability claim deriving from a hospital's non-delegable duty to oversee all persons who practice medicine within its walls. *Id.* at 48 (citing *Welsh*, 698 A.2d at 586). *Thompson* and *Welsh*, appellee suggests, "contemplate[d] the kind of systemic negligence" which harms a patient. *Id.* at 49 n. 15 (quoting *Edwards v. Brandywine Hosp.*, 438 Pa.Super. 673, 652 A.2d 1382, 1387 (1995)). Similarly, in *Shannon*, the focus was on systemic negligence affecting patients given the "central role played by HMOs in the total health care of its [sic] subscribers." *Id.* at 49 (quoting *Shannon*, 718 A.2d at 835). According to appellee, the court concluded that, although HMOs did not practice medicine, they involved themselves in decisions affecting a subscriber's medical care which, as a result, had to be medically reasonable.

Appellee offers that the doctrine of corporate negligence should be applied on a case-by-case basis, as it has been so far, based on a "functional analysis" that inquires into whether an entity performs functions which fall within, or are similar to, the duties articulated in *Thompson*. According to appellee, pursuant to this test, nursing homes and their corporate operators may be held liable for corporate negligence. Appel-

lee then avers that, applying the test here, Grane Healthcare controlled Highland Park and "involved itself in all aspects relating to resident care," including by providing hands-on-care to Ms. Scampone and other residents, controlling the budget and staffing decisions of the Center. Appellee's Brief at 51 (emphasis omitted). Appellee also reasserts trial allegations regarding Grane Healthcare's decisions to understaff the Center and to conceal problems related to understaffing.

Appellee argues that its claims of corporate negligence do not duplicate existing vicarious liability duties in this instance, or as a rule of general applicability. According to appellee, corporate negligence is not a means to impose liability on nursing homes for physicians' conduct that they cannot control; appellee notes as an example that, in this case, there were no allegations of negligence against physicians. Rather, the allegations of negligence were made against appellants regarding their own conduct. For further elucidation, appellee draws the following distinction: "although a nursing home would be vicariously liable for the negligent conduct of its nurse employees committed within the scope of employment ... when nurses fail to act in circumstances entirely beyond their control, and that failure results in harm to a patient, the proper cause of action may fall under the doctrine of corporate negligence." Appellee's Brief at 54 (emphasis omitted). Appellee argues that corporate decisions often are made collectively and the acts of any one person may not rise to the level of negligent conduct or responsibility may be difficult to place; but, under such circumstances, it is proper to impose liability on the corporation rather than on individual participants in the corporate decision-making process.

Next, appellee asks the Court to reject appellants' narrow approach to corporate liability in the healthcare context centered on *Thompson* and the requirement of "comprehensive care." Appellee claims that the "comprehensive care" requirements are relevant to prove medical malpractice but are immaterial in ordinary negligence matters implicating, for example, the healthcare corporation's liability as landowner. Appellee's Brief at 56 n. 22 (quoting 3 West's Pa. Practice,

Torts: Law & Advocacy § 7.31 (2010)) ("[W]ith respect to the provision of safe facilities, hospitals have always been held responsible for the condition of their physical plant, in the same manner as any landowner. In this respect, therefore, *Thompson* is merely a restatement of Pennsylvania law.").

Appellee further directs the Court's attention to jurisprudence distinguishing between claims of professional versus ordinary negligence. According to appellee, not all care in a nursing home bears a substantial relationship to the rendition of medical care by a medical professional and, accordingly, not all deviations from the standard of care are medical negligence to be pursued as claims of medical malpractice. *Id.* at 56–60 (citing *Merlini v. Gallitzin Water Auth.*, 602 Pa. 346, 980 A.2d 502 (2009); *Estate of Swift v. Northeastern Hosp. of Philadelphia*, 456 Pa.Super. 330, 690 A.2d 719 (1997)). For example, appellee states, assessment of a resident's condition and the development of a care plan may require specialized medical skills and any departures from the standard of care may give rise to professional malpractice claims; by comparison, a nursing home's failure to ensure the staff's compliance with the plan or the staff's performance of routine non-medical services for residents will generally give rise to claims of ordinary negligence. *Id.* at 60 (citing *Estate of French v. Stratford House*, 333 S.W.3d 546, 560 (Tenn.2011)). The claims at issue here, appellee asserts, sound in ordinary negligence, because they involve the Center's failure to provide routine care: providing food and water. Accordingly, appellee states that evidence regarding the level of care, *i.e.*, comprehensive or total, that Highland Park or Grane Healthcare offer is unnecessary to establish appellee's claim against appellants.[5]

5. Appellee also suggests that recognizing appellants' theory of limited nursing home liability would have unintended consequences. For example, residents of privately-owned nursing homes would have fewer rights of recovery than residents of state-owned facilities because, according to appellee, federal courts have recognized that "the Nursing Home Reform Act creates individual rights on behalf of nursing home residents to proper care and treatment sufficient to permit a civil rights action under 42 U.S.C. § 1983" against a county-owned facility that failed to comply with the Act's requirements. Appellee's Brief at 50–51

Finally, appellee suggests that adopting appellants' interpretation of *Thompson* would endanger the lives of elderly nursing home residents and should not be the law of the Commonwealth.

In reply, appellants largely reiterate their initial claims and again request that causes of action for "corporate negligence" be limited to hospitals and healthcare entities that provide comprehensive care, like HMOs.[6] According to appellants, after the *Flagiello* decision, the Court "had the ability to write on a clean slate in defining the liability of hospitals," and chose to expand liability slowly and gradually, in light of the distinct and complex relationships between hospitals and the actual providers of medical care, the physicians. Appellants' Brief at 8–10 (citing *Flagiello*, 208 A.2d at 208 (*respondeat superior*

n. 17. Appellee also refers to instances in which the absence of corporate liability would deny civil recourse to victims of extreme abuse or neglect in nursing homes, whose treatment may give rise to criminal charges. Appellee states that *Thompson* did not purport to immunize healthcare entities from liability for criminal conduct nor was it intended to have such an effect. *Id.* at 62 (citing 18 Pa.C.S. § 2713(a), (f) ("owner, operator, manager or employee of a nursing home" may be prosecuted for felony for neglecting care-dependent person)).

Appellants respond that their interpretation of *Thompson* is not an assertion of immunity from criminal prosecution and that, in this instance, there were no criminal charges filed as a result of Ms. Scampone's death. Moreover, appellants offer that, although the Commonwealth may bring criminal charges for criminal abuse in a nursing home, the availability of such charges does not create a civil cause of action for corporate negligence. Appellants' Reply Brief at 23–24. Appellants also note that appellee waived any claims based on negligence arising from the criminal conduct of either appellants or their employees.

The parties' assertions with respect to either non-corporate nursing home liability or to liability arising in the context of criminal charges of extreme abuse are beyond the fair scope of our limited grant of review in this case, are not fully developed or briefed and, accordingly, to the extent that they may be viewed as anything other than policy arguments, we decline to address them at any length.

6. In their reply brief, appellants also undertake an extensive reexamination of the record at trial. We reiterate that this Court did not accept for review any issues regarding the sufficiency of the evidence to prove corporate negligence or any other claim. Accordingly, we refrain from addressing in any detail the parties' representations regarding the record of the initial trial or any related arguments on whether the Scampone estate could meet its burden of proof upon a remand.

liability); *Capan v. Divine Providence Hosp.*, 287 Pa.Super. 364, 430 A.2d 647 (1980) (ostensible agency liability); *Thompson*, 591 A.2d at 707 (corporate/direct liability)). Appellants argue that the significant legal responsibilities placed on hospitals are commensurate with their market status and public importance, and that no other healthcare entity presents the same obstacles to the development of tort liability. Accordingly, appellants claim, this Court should not recognize duties—like those imposed by the corporate negligence doctrine—outside of the hospital context, or apply it to entities such as Highland Park or Grane Healthcare.

Appellants also develop the argument that corporate negligence liability duplicates existing causes of action, specifically the vicarious liability claim that appellee asserted. Appellants argue that a corporation acts through its employees and, accordingly, the doctrine of *respondeat superior* functions in every instance to address any claim of negligence in a nursing home, even where the employee actually responsible is unknown. According to appellants, a corporate negligence cause of action would cause jury confusion and potential double recoveries, and would not advance any interest in protecting nursing home residents. Appellants assert that the Superior Court's recognition of appellee's corporate negligence claim extends malpractice liability to non-licensed healthcare providers and exposes multiple entities "for the exact same nondelegable duties." Appellants' Brief at 13.

Appellants also forward several waiver arguments. According to appellants, appellee did not present any issue of ordinary negligence to the jury and, as such issue is distinct from the claim of corporate negligence actually offered, appellee waived it. Moreover, appellants insist that the theory of corporate negligence is distinct from "ordinary negligence," and did not exist prior to its adoption in *Thompson* as to hospitals, or prior to *Shannon* as to any other healthcare provider. Corporate negligence liability, appellants assert, was a response to the perceived inadequacy of existing forms of vicarious liability. Appellants reject appellee's argument that the theory of direct liability of a corporation exists outside

of *Thompson*, and ask the Court to interpret prior decisions cited by appellee as consistent with the theory that corporations act only through their employees and are, as a result, liable only vicariously, and never directly, for negligence. Moreover, appellants view *Thompson* as a departure from the *Flagiello* decision: *Flagiello*, according to appellants, recognized that "the hospital's liability must be governed by the same principles of law as apply to other employers," while *Thompson* recognized non-delegable duties of a corporate hospital "that go beyond the duty of an employer recognized in *Flagiello*." [7] Appellants suggest that this Court should reject any assertion that the *Flagiello* decision stands for the proposition that all employers are subject to corporate negligence liability. *Id.* at 17–18.[8]

Finally, appellants reiterate their claim that "expanding corporate negligence beyond hospitals presents a multitude of difficult policy issues." *Id.* at 21. According to appellants, appellee has offered no compelling policy arguments or proof that such an expansion would be effective to increase protection of nursing home residents. Appellants accuse appellee of being interested in "putting the nursing homes industry out of business," an objective which, appellants state, is in the legislative bailiwick.[9]

7. Appellants also argue that an extension of the doctrine of corporate negligence does not address the liability of non-corporate owners of nursing homes and, therefore, the entire analytical scheme proposed by appellee should be rejected. We reject this argument as both undeveloped and lacking cogency.

8. Appellants dispute appellee's assertions that its claims sound in ordinary negligence by citing the record at length, including appellee's offers of expert testimony and counsel's arguments. According to appellants, appellee proceeded on theories of professional liability only, and any claims of ordinary negligence were waived. Appellants' Brief at 18–21. Our grant of discretionary review cannot be fairly interpreted to encompass a dispute of whether appellee's claims sound in professional or ordinary negligence; nor is resolution of this issue necessary for the purposes of decision here. Accordingly, we express no view on the matter.

9. In support of this extreme contention, and purportedly as a response to appellee's references that appellants misrepresented the trial record on this issue, appellants ask the Court to take judicial notice of items on appellee's counsel's website. The parties offer no explanation of the

## III. Decisions Below

Relevant here, the trial court granted the motion for compulsory nonsuit on the claim of "corporate negligence" against Grane Healthcare, but permitted the same claim against Highland Park to go to the jury. The jury rendered a verdict in favor of the Scampone estate and found Highland Park liable under the corporate negligence theory. In addition to advancing several other challenges, both parties raised and preserved claims of error related to the corporate negligence decisions of the trial court in their Rule 1925(b) statements and on appeal to the Superior Court.

The trial court explained its decision with respect to Highland Park's liability in its Rule 1925(a) opinion.[10] The court noted that "corporate negligence" was first recognized in *Thompson* with respect to hospitals, and then in *Shannon* with respect to HMOs. The court noted that appellate courts had yet to apply the *Thompson/Shannon* construct to a nursing home, but emphasized that no decision had exempted nursing homes from its application either. The court concluded that it "discern[ed] no reasoning within the *Thompson* or *Shannon* decisions to treat a nursing home, such as Highland Park Care Center, any differently than a hospital or an HMO with respect to corporate negligence liability." According to the court, the central role played by the healthcare entity in the total care of its patients was the key factor in whether a corporate negligence claim was viable against the entity. Where the entity injected itself in the medical decisions affecting the patient's care, it had an obligation to do so in a

relevance of these allegations to the narrow issue on review; as a result, we do not explore the allegations in any great detail. We will note, however, our expectation that counsel will undertake to respect the code of civility and decorum appropriate when appearing before this Court and, upon remand, before the trial court.

**10.** The trial court did not address appellee's claim of error regarding the compulsory nonsuit and the liability of Grane Healthcare under the corporate negligence theory in its Rule 1925(a) opinion. Appellee asked the Superior Court to remand for the trial court to prepare a supplemental opinion on this issue, but the Superior Court denied the request on the ground that the absence of an opinion did not affect its ability to conduct effective appellate review. *See Scampone,* 11 A.3d at 973.

medically reasonable manner. Tr. Ct. Op., 2/8/2008, at 9–10. The trial court grounded its decision in the evidence adduced by the Scampone estate at trial. According to the court, the estate had properly proven its theory of corporate liability with evidence that the staffing decisions of Highland Park directly and detrimentally affected Ms. Scampone's care and ultimately caused her decline and death; such allegations were materially akin to those that might be asserted pursuant to *Thompson* or *Shannon* against a hospital or HMO, respectively. *Id.* at 11.

On appeal, the Superior Court affirmed the trial court's decision related to Highland Park's "corporate negligence" liability but reversed on the same issue with respect to Grane Healthcare; the panel remanded the matter for a new trial. After resolving preliminary questions, the panel addressed Highland Park's contention that a nursing home does not function as a hospital and, therefore, is not liable as a matter of law for "corporate negligence." The panel subscribed to the view that this Court first adopted "corporate negligence" as a basis for liability against a hospital in *Thompson,* and that the Superior Court later "extended" the theory of liability in *Shannon* and *Hyrcza* to HMOs and medical professional corporations, respectively. According to the panel, "a nursing home is analogous to a hospital in the level of its involvement in a patient's overall health care" and, therefore, Highland Park's contention that it did not function as a hospital had to be rejected. *Scampone,* 11 A.3d at 976 (citing *Shannon, supra,* and *Hyrcza v. West Penn Allegheny Health Sys.,* 978 A.2d 961 (Pa.Super.2009)). The panel described the services received by Ms. Scampone as a full-time resident of Highland Park, including: twenty-four hour care, intake assessment and development of a care plan, rehabilitative care, and responsibility for carrying out a doctor's orders, even where the nursing home did not employ staff physicians. The type of comprehensive care provided by the nursing home differed from the type of "sporadic care offered on an out-patient basis in a physician's office," which the Superior Court had previ-

ously held did not give rise to "corporate negligence" liability. *Id.*

With respect to Grane Healthcare, the Superior Court held that the trial court erred in granting a compulsory nonsuit. According to the panel, the evidence introduced by appellees established that "Grane actually was in charge of managing the nursing home and its employees oversaw the quality of patient care"; indeed, the panel concluded, "Grane actually controlled the care." *Id.* at 990. Based upon its corporate control over Highland Park and the comprehensive nature of care provided to the nursing home's residents, the Superior Court concluded that Grane Healthcare was subject to corporate liability. The court held that Grane Healthcare owed certain duties to the residents, as outlined in *Thompson,* particularly "to use reasonable care in the maintenance of safe and adequate facilities and equipment, and to formulate, adopt, and enforce adequate rules and policies to ensure quality of care for the facility's residents." *Id.* at 991. Indeed, the panel noted, the last duty was Grane's purpose for being at the nursing home. *Id.* at 991 n. 3. The court therefore reversed the grant of compulsory nonsuit and remanded the case to the trial court for a new trial.[11]

## IV. Analysis

### A. The Scope and Standard of Review

As a procedural matter, the question is whether the Superior Court erroneously resolved challenges to the trial court's compulsory nonsuit decisions, based on its conclusions regarding the scope of "corporate negligence" and appellants' potential exposure under that theory of liability. A trial court may enter a compulsory nonsuit on any and all causes of action if, at the close of the plaintiff's case against all defen-

11. The panel also addressed whether the trial court improperly granted a compulsory nonsuit on the issue of punitive damages and concluded that the Scampone estate's claims against Highland Park and Grane Healthcare in that regard should have been submitted to the jury. There is no challenge on appeal with respect to punitive damages and, accordingly, we do not review the Superior Court's decision in this regard.

dants on liability, the court finds that the plaintiff has failed to establish a right to relief. Pa.R.C.P. No. 230.1(a), (c); *see Commonwealth v. Janssen Pharmaceutica, Inc.*, 607 Pa. 406, 8 A.3d 267, 269 n. 2 (2010). Absent such finding, the trial court shall deny the application for a nonsuit. On appeal, entry of a compulsory nonsuit is affirmed only if no liability exists based on the relevant facts and circumstances, with appellant receiving "the benefit of every reasonable inference and resolving all evidentiary conflicts in [appellant's] favor." *Agnew v. Dupler*, 553 Pa. 33, 717 A.2d 519, 523 (1998). The compulsory nonsuit is otherwise properly removed and the matter remanded for a new trial.

Here, the determination hinges on the narrow legal question of whether a patient may hold a nursing home and/or affiliated entities liable under the "corporate negligence" theory articulated in *Thompson.* This question implicates issues of law subject to *de novo* review and plenary scrutiny. *Samuel–Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1, 15 (Pa.2011). The Court is not limited by the specific grounds invoked by the Superior Court and may affirm for any valid reason of record. *Pennsylvania Dep't of Banking v. NCAS of Delaware, L.L.C.*, 596 Pa. 638, 948 A.2d 752, 761 (2008).

Based on the arguments that appellants offer, our inquiry encompasses claims regarding the categorical exemption from negligence liability of nursing homes and related entities, as well as claims regarding appellants' specific duties of care. We address the issues in sequence.

B. *Negligence, Generally; Theories of Liability and Categorical Exemptions*

■ Initially, while conceding their exposure to vicarious liability, appellants argue that nursing homes and affiliated entities are categorically exempt from liability on a direct negligence theory. According to appellants, corporations act through their officers, employees, and agents and, therefore, are not susceptible to direct negligence claims. Moreover, appellants claim that "extending" direct liability to nursing

homes and affiliated entities, specifically, is particularly onerous and inappropriate under existing law.

■■■ Generally, to state a cause of action for negligence, a plaintiff must allege facts which establish the breach of a legally recognized duty or obligation of the defendant that is causally connected to actual damages suffered by the plaintiff. *Bilt–Rite Contractors, Inc. v. The Architectural Studio*, 581 Pa. 454, 866 A.2d 270, 280 (2005). The plaintiff proves the duty and breach elements by showing that the defendant's act or omission fell below the standard of care and, therefore, increased the risk of harm to the plaintiff. *Thierfelder v. Wolfert*, 52 A.3d 1251, 1264 (Pa.2012). Once the plaintiff has carried this burden, s/he must further demonstrate the causal connection between the breach of a duty of care and the harm alleged: that the increased risk was a substantial factor in bringing about the resultant harm. *See Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280, 1288 (1978). "[T]he necessary proximate cause will have been made out if the jury sees fit to find cause in fact." *Id.* Liability "for negligent injury serves a two-fold purpose, for it both assures payment of an obligation to the person injured and gives warning that justice and the law demand the exercise of care." *Flagiello*, 208 A.2d at 201. "[R]emedies attempt primarily to put an injured person in a position as nearly as possible equivalent to his position prior to the tort." *Trosky v. Civil Serv. Comm'n*, 539 Pa. 356, 652 A.2d 813, 817 (1995) (quoting RESTATEMENT OF TORTS 2D § 901, cmt. a (1979)).

■■ Immunity from negligence liability is an exceptional protection, which may be granted on public policy grounds to categories of entities. As the *Flagiello* Court noted in 1965, "[n]on-liability is an anachronism in the law of today. It is a plodding ox on a highway built for high speed vehicles. It is out of tune with the life about us, at variance with modern-day needs and with concepts of justice and fair dealing." 208 A.2d at 201. The *Flagiello* Court, consistently with this assessment, rejected the charitable immunity asserted as a complete defense by the defendant, a corporate hospital, and com-

menced a process of discarding then-existing judicially-created forms of immunity. *Id.* at 208; *see also Mayle v. Pa. Dep't of Highways,* 479 Pa. 384, 388 A.2d 709 (1978) (sovereign immunity); *Ayala v. Philadelphia Bd. of Pub. Educ.,* 453 Pa. 584, 305 A.2d 877 (1973) (local government immunity); *Falco v. Pados,* 444 Pa. 372, 282 A.2d 351 (1971) (parental immunity). No matter the charitable notion associated with hospitals earlier, according to the Court, the hospital of the day functioned as a business, "by charging and receiving money for what it offer[ed], [and, accordingly,] it must be a business establishment also in meeting obligations it incur[red] in running that establishment." The Court held that: "[o]ne of [the hospital-defendant's] inescapable obligations is that it must exercise a proper degree of care for its patients, and, to the extent that it fails in that care, it should be liable in damages as any other commercial firm would be liable." 208 A.2d at 197.

Although the General Assembly later re-established rights of immunity by statute (*e.g.,* for the sovereign and local government in some instances), hospitals and similar entities that had enjoyed judicially-created immunity prior to 1965 did not obtain the benefit of broad statutory immunity. *See* 1 Pa.C.S. § 2310, 42 Pa.C.S. §§ 8521, 8541. Relevant here (whether or not affected by the immunity regime governing hospitals), nursing homes and related entities do not enjoy any judicially or legislatively created immunity carve-out from liability. *See* 42 Pa.C.S. § 8331 *et seq.* Where a recognized immunity does not apply, a corporation may be sued in tort, including for negligence. *Snead v. Soc'y for Prevention of Cruelty to Animals of Pa.,* 604 Pa. 166, 985 A.2d 909, 913–15 (2009).

■■ To prove negligence, a plaintiff may proceed against a defendant on theories of direct and vicarious liability, asserted either concomitantly or alternately. Liability for negligent injury is direct when the plaintiff seeks to hold the defendant responsible for harm the defendant caused by the breach of a duty owing directly to the plaintiff. By comparison, vicarious liability is a policy-based allocation of risk. *Crowell v. City of*

*Philadelphia,* 531 Pa. 400, 613 A.2d 1178, 1181 (1992). "Vicarious liability, sometimes referred to as imputed negligence, means in its simplest form that, by reason of some relation existing between A and B, the negligence of A is to be charged against B although B has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that he possibly can to prevent it." *Id.* (quoting Prosser and Keeton on Torts § 69, at 499 (5th Ed.1984)). Once the requisite relationship (*i.e.,* employment, agency) is demonstrated, "the innocent victim has recourse against the principal," even if "the ultimately responsible agent is unavailable or lacks the ability to pay." *Mamalis v. Atlas Van Lines, Inc.,* 522 Pa. 214, 560 A.2d 1380, 1383 (1989); *accord Crowell,* 613 A.2d at 1182 (vicarious liability is policy response to "specific need" of how to fully compensate victim).

Where a corporation is concerned, the ready distinction between direct and vicarious liability is somewhat obscured because we accept the general premise that the corporation acts through its officers, employees, and other agents. *See Tayar v. Camelback Ski Corp., Inc.,* 47 A.3d 1190, 1196 (Pa.2012). The corporation, as principal, assumes the risk of individual agents' negligence under the theory of vicarious liability. *See, e.g., Iandiorio v. Kriss & Senko Enters., Inc.,* 512 Pa. 392, 517 A.2d 530 (1986); *Aiello v. Ed Saxe Real Estate, Inc.,* 508 Pa. 553, 499 A.2d 282 (1985). In this scenario, the corporation's liability is derivative of the agents' breach of their duties of care to the plaintiff. But, this Court has also recognized that a corporation may also owe duties of care directly to a plaintiff, separate from those of its individual agents, such as duties to maintain safe facilities, and to hire and oversee competent staff. *See, e.g., Thompson, supra* (corporate hospital owed patient non-delegable duty of care to enforce consultation and patient monitoring policies); *Gilbert v. Korvette, Inc.,* 457 Pa. 602, 327 A.2d 94, 102 (1974) (corporation owed customer non-delegable duty of care to maintain premises); *Dempsey v. Walso Bureau, Inc.,* 431 Pa. 562, 246 A.2d 418 (1968) (corporation owed employee duty of reasonable care in hiring other employees); *accord Atcovitz v. Gulph*

*Mills Tennis Club, Inc.,* 571 Pa. 580, 812 A.2d 1218 (2002) (if duty exists, corporation may be held directly liable for negligence). Accordingly, as a general proposition, the recognition that a corporation acts through its agents has not been held to be a fatal impediment to haling a corporation into court on direct liability tort claims. *Accord Mamalis,* 560 A.2d at 1383 ("termination of the claim against the agent extinguishes the derivative [vicarious liability] claim against the principal" but not separate claim based on principal's "affirmative act or failure to act when required to do so"). Appellee aptly illustrates how the distinct theories of liability offer accountability for acts or omission of actors functioning within complex corporate structures. Appellants, on the other hand, while insisting on a categorical exemption from direct liability for negligence, offer no relevant legal support to the contrary.

Moreover, appellants forward no persuasive argument for the proposition that the availability of a vicarious liability claim is a substitute for recognizing a corporation's direct and non-delegable duty or duties of care to a plaintiff. Appellants suggest that we should not recognize corporate direct liability because claims under such a theory are substantially similar to vicarious liability claims against corporations, and permitting only vicarious liability claims against the corporate entity promotes simplicity and fairness, as appellants perceive it. According to appellants, juries will likely be confused by the assertion of both direct and vicarious claims against a corporation, leading to double recoveries. We disagree. The direct and vicarious theories of liability are grounded in distinct policies and serve complementary purposes in the law of torts, with the goal of fully compensating a victim of negligence in an appropriate case. The distinctions between direct and vicarious negligence theories are no more or less confusing than other legal concepts, and it is incumbent upon the parties, through their attorneys, to aid courts in narrowing issues and formulating appropriate instructions to guide juries in their factual determinations and to avoid the possibility of double recoveries. Bright lines and broad rules always offer a superficially enticing option. However, we cannot elevate the

lull of simplicity over the balancing of interests embodied by the principles underpinning our negligence jurisprudence. *See Flagiello*, 208 A.2d at 201 (liability for negligence assures compensation for injury and "gives warning that justice and the law demand the exercise of care"). Ultimately, appellants have offered no sound justification to upset the existing and well-rooted balance of equities reflected in our negligence decisional law.

Appellants also suggest that nursing homes and affiliated corporate entities, specifically, are currently exempt from liability on any direct negligence claims and suggest that the Court should refrain from extending liability in this regard. Appellants' central presumption is that direct liability does not attach to a particular defendant until this Court recognizes access to the cause of action against the relevant type of entity, here, the corporate nursing home and/or affiliated corporate entities. According to appellants, the jurisprudential role of the *Flagiello* decision was to create a clean slate upon which the Court built by creating new causes of action to be asserted only against hospitals, in recognition of hospitals' importance and market status. Appellants argue against what they see as "expanding" the exposure for direct liability to nursing homes and related entities, by referring to policy-driven considerations, such as the alternative availability of compensation for an injured plaintiff, allegations of an exponential increase in operational and litigation costs for the nursing home industry, and the ostensible difficulties in creating any test by which to apply what they say is this "new" form of liability to nursing homes and affiliated entities.

 In light of our prior discussion, it is clear that appellants' presumption is misplaced. Immunity or exemption from liability is the exception to the general rule that an entity must meet the obligations it incurs in functioning. *Flagiello, supra*. Negligence liability, based on direct and vicarious theories, is a long-tenured cause of action at common law, and it serves to make whole a plaintiff for the injury caused by a defendant's breach of a legal duty to the plaintiff. Like any other cause of action at common law, negligence evolves

through either directly applicable decisional law or by analogy, meaning that a defendant is not categorically exempt from liability simply because appellate decisional law has not specifically addressed a theory of liability in a particular context. Categorical exemptions from liability exist (following the dismantling by this Court of judicial immunities in the 1960s and 1970s) only where the General Assembly has acted to create explicit policy-based immunities, *e.g.*, to protect the public purse. Where either no immunity exists, or the legislative branch created exceptions to an immunity legislatively conferred, the default general rule of possible liability operates. *See, e.g.*, 42 Pa.C.S. §§ 8522(a), 8542(a); *Mascaro v. Youth Study Ctr.*, 514 Pa. 351, 523 A.2d 1118, 1121 (1987); *accord Michel v. City of Bethlehem*, 84 Pa.Cmwlth. 43, 478 A.2d 164, 165 (1984). As noted, the General Assembly has not bestowed the benefit of immunity either upon nursing homes or upon similar or related entities.

To the extent that appellants' arguments are also tantamount to a request that we recognize a form of judicial immunity for nursing home-related entities, we decline the invitation. The *Flagiello* decision, and subsequent caselaw, explained why we disfavor categorical exemptions from liability by judicial fiat and we are not inclined to reconsider our jurisprudence in this regard on the presentation made. Notably, we reject any entreaty to carve out a special tort-insulated status for the nursing home industry based upon appellants' predictions of financial doom and the relatively lowmarket profile status of nursing homes. We do not doubt that the industry operates upon a thin margin; nevertheless, the question of tort insulation requires an assessment and balancing of policies best left to the General Assembly. From the judicial perspective, the duty at law is independent of the financial status of a defendant. As the *Flagiello* Court explained, "[t]here is scarcely a defendant against whom a money judgment is returned but will be hurt or bruised to some extent through expenditure of money which he would prefer to keep in his pocket. But what follows in the wake of a judgment

cannot be determinative of the issue as to whether law and justice dictate that judgment." 208 A.2d at 204.

Accordingly, we reject appellants' suggestion that nursing homes and related entities should be held to be categorically immune from direct liability claims.

C. *The Duty of Care, Generally; Thompson and Its Superior Court Progeny Shannon, Sutherland, and Hyrcza*

 Appellants' next argument is narrower, addressed specifically to the first element of a negligence claim—the duty of care. Appellants suggest that we disclaim the Superior Court's recognition that Highland Park and Grane Healthcare owed nondelegable duties of care directly to Ms. Scampone. According to appellants, the Scampone estate relied exclusively on this Court's decision in *Thompson* to assert its claim of negligence. But, appellants state, the *Thompson* decision is inapposite because the decision was limited, creating a cause of action only against hospitals. And, because nursing homes are not hospitals and function differently from hospitals, appellants say, nursing homes and affiliated entities owe no duty of care to their residents.

 The question of duty in tort is "a legal determination, assigned in the first instance to the trial court." *Thierfelder*, 52 A.3d at 1264 (quoting *Sharpe v. St. Luke's Hosp.*, 573 Pa. 90, 821 A.2d 1215, 1219 (2003)). We have said that, to determine whether a defendant owes a plaintiff a duty of care, this Court must consider several factors: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." *Althaus v. Cohen*, 562 Pa. 547, 756 A.2d 1166, 1169 (2000).

In 1991, the Court added to earlier jurisprudence in the medical field by addressing the question of whether a corporate hospital could be held directly liable for negligence. In *Thompson*, defendant hospital admitted Ms. Thompson to the

emergency room following a car accident. Because of a prior physician-patient relationship, the attending nurse transferred direct care of Ms. Thompson to the second defendant, a general practitioner who did not practice emergency medicine but had staff privileges at the hospital. The general practitioner prescribed a course of treatment for the accident-related trauma and recommended, *inter alia,* a consult with a cardiologist to assess the impact on Ms. Thompson's condition of her anticoagulant treatment for heart disease. Ms. Thompson was moved the same day to the hospital's intensive care unit, after she showed no immediate improvement.

The day following the accident, Ms. Thompson began exhibiting signs of a neurological condition, including bleeding in the eye and an inability to move her left foot and toes. Another specialist consult, on the third day of hospitalization, revealed that Ms. Thompson had a progressive neurological issue with paralysis on the left side caused by a large intracerebral hematoma "secondary to anticoagulation." The general practitioner confirmed the neurological condition but took no immediate action. On the fourth day, a general surgeon called upon for another consult withheld administration of anticoagulant medication, noting that Ms. Thompson's paralysis had become complete. Ms. Thompson did not recover motor function on her left side upon discharge. She subsequently sued the hospital and the general practitioner co-defendants, on theories of vicarious and direct liability. The trial court granted a defense motion for summary judgment and dismissed the hospital from the action; the Superior Court reversed. On appeal, this Court affirmed.

The *Thompson* Court adopted an ostensibly novel theory of liability—"corporate negligence"—under which a hospital operating primarily on a fee-for-service basis can be held liable if it breaches the non-delegable duty of care owed directly to the patient to ensure "the patient's safety and well-being" while at the hospital. The Court surveyed the jurisprudence of other states to identify "four general areas" into which a hospital's responsibilities to its patients could be classified: (1) duties to use reasonable care in the maintenance of safe and adequate

facilities and equipment; (2) duties to select and retain competent physicians; (3) duties to oversee all persons who practice medicine within the hospital's walls; and (4) duties to formulate, adopt, and enforce adequate rules and policies to ensure quality patient care. *See Thompson,* 591 A.2d at 707.

The *Thompson* Court described the recognition of the "corporate negligence" theory as the next step in the evolution of hospital liability in the Commonwealth. The Court noted that the 1965 *Flagiello* decision was a turning point in the perception of hospitals as charitable organizations, which led to the abolition of hospitals' common law immunity. According to the *Thompson* Court, hospitals had "evolved into highly sophisticated corporations operating primarily on a fee-for-service basis. The corporate hospital of today has assumed the role of a comprehensive health center with responsibility for arranging and coordinating the total health care of its patients." *Id.* at 706.

As the *Thompson* Court recounted, following the *Flagiello* decision, the courts of the Commonwealth gradually recognized aspects of a hospital's liability to a patient, as cases presented themselves. *Id.* (citing *Tonsic v. Wagner,* 458 Pa. 246, 329 A.2d 497 (1974) *(respondeat superior* liability); *Capan v. Divine Providence Hosp.,* 287 Pa.Super. 364, 430 A.2d 647 (1980) (ostensible agency liability); *Riddle Mem. Hosp. v. Dohan,* 504 Pa. 571, 475 A.2d 1314 (1984) (direct liability)).[12]

12. That the evolution of recognized bases of liability in the healthcare realm took place primarily against the background of claims against hospitals is not surprising, and the circumstance alone is not a basis to limit corporate liability to hospitals without consideration of other pertinent factors. It appears that cases implicating hospital liability, rather than the liability of other corporate entities providing healthcare services, have reached appellate courts more often, which may be explained by the nature of the services provided by hospitals (*i.e.,* acute care) and the relative historic prevalence of hospitals as healthcare providers as compared, for example, to nursing homes.

Moreover, hospitals had enjoyed explicit judicially-created immunity in Pennsylvania prior to the *Flagiello* decision. Some implications of the *Flagiello* decision were perhaps obvious to litigants while other applications were ardently disputed, reaching appellate courts. An example of the latter type of case is *Tonsic,* a matter in which this Court held that both an operating surgeon and a hospital may be held

Notably, the *Thompson* Court described the *Riddle* decision as a "critical step" toward recognition of a hospital's direct liability to a patient, which had already been taken in the Commonwealth before *Thompson* came before the Court. In *Riddle*, this Court had held that Section 323 of the Restatement (Second) of Torts adequately described the duty of care a hospital owed to a patient:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

vicariously liable for the negligence of the hospital's surgical personnel. 329 A.2d at 500 (personnel acted as "servant[s] of two masters, not joint employers, at one time as to one act, provided that the service to one does not involve abandonment of the service to the other"). Another example is *Capan*, in which the Superior Court again addressed aspects of vicarious liability in the context of a medical malpractice claim against a hospital. 430 A.2d at 648–50 (hospital is vicariously liable for acts of independent contractor/physician under ostensible agency theory, which acts as exception to general rule that employer is not liable for acts of independent contractor). Both decisions addressed the respective legal principles in the context of the claims presented against a defendant hospital. Yet, neither decision purported to limit application of its holding to hospitals and, indeed, appellants do not dispute that a nursing home and related entities may be found liable on vicarious liability theories similar to those presented in *Tonsic* and *Capan*.

Finally, accepting that holdings establishing a hospital's corporate liability do not automatically suggest a similar approach to other corporate entities is the start, not the end, of the question. The distinctions articulated must be evaluated to determine whether they make a difference measured against bedrock principles of tort law. Accordingly, we may accept appellants' argument that the *Tonsic* and *Capan* decisions illustrate that hospitals are categorically different from other corporate entities providing healthcare services; however, for the reasons we develop in the text, we do not believe those differences matter when it comes to assessing corporate liability in tort.

*Thompson,* 591 A.2d at 708 (citing *Riddle* and quoting RE-STATEMENT OF TORTS 2D § 323 (1965)). Next, as the evolutionary apex of hospital liability, according to the *Thompson* Court, was recognition of a hospital's corporate liability and of the categories of duties identified. *Id.* In dissent, Justice (later Chief Justice) Flaherty decried the majority's decision, noting that there was "no logical basis upon which to limit this extension of liability to hospitals alone." *Id.* at 709 (Flaherty, J., dissenting). The majority did not respond to the dissent's characterization of its opinion, upon which appellants now seize.

Following this Court's decision in *Thompson,* the Superior Court had the opportunity to address the question of whether several types of healthcare entities, other than hospitals, owed directly to their patients similar duties to those recognized in *Thompson.* In *Shannon,* the Superior Court held that an HMO may be held liable under the corporate negligence theory articulated by this Court, if the HMO provides healthcare services, rather than money to pay for such services, because such an HMO owes a duty directly to the patient to make decisions which "pass the test of medical reasonableness." 718 A.2d at 835–36. The Superior Court was deciding, *inter alia,* whether the trial court had properly granted a nonsuit on the negligence claim of the Shannons, whose son had been born prematurely and subsequently died of related complications. Ms. Shannon was the subscriber to an HMO that permitted her to choose an obstetrician from an approved list but also provided direct care via a telephone service staffed by registered nurses employed directly by the HMO. Ms. Shannon had complained on multiple occasions to both the obstetrician and the HMO's nurses that she had symptoms of pre-term labor starting on October 2, 1992, but the medical professionals declined to refer her for in-person examination until October 12, ten days later. Upon admission to the hospital, Ms. Shannon gave birth to her son prematurely; the baby died two days after birth. The Shannons sued the obstetrician as well as the HMO alleging, *inter alia,* that the HMO could be held directly liable under *Thompson.*

The Superior Court agreed, perceiving "no reason why the duties applicable to hospitals should not be equally applied to an HMO when that HMO is performing the same or similar functions as a hospital." *Id.* at 836 (relying in part on *McClellan v. Health Maint. Org. of Pa.,* 413 Pa.Super. 128, 604 A.2d 1053 (1992)). The panel rested its decision on the conclusion that the HMO played a "central role ... in the total health care of its subscribers ... with the subscribers being given little or no say so in the stewardship of their care." The panel further noted that "while [HMOs] do not practice medicine, they do involve themselves daily in decisions affecting their subscriber's medical care" and, accordingly, when an HMO interjects itself in that fashion, it has to do so "in a medically reasonable manner" or "be held corporately liable for a breach of any of the *Thompson* duties which causes harm to its subscribers." *Id.*

By comparison, in the 2004 *Sutherland* decision, the Superior Court rejected a physician defendant's request to find error in the refusal of the trial court to instruct the jury on a corporate negligence theory with respect to a physician's office co-defendant. 856 A.2d at 61–62. Ms. Sutherland, the patient, had suffered skin necrosis following surgery to her calf and ankle conducted by the physician defendant at a local hospital; the physician applied a splint to the area post operation and Ms. Sutherland developed related complications. On subsequent days, Ms. Sutherland called the physician's office co-defendant, with which the physician was affiliated, and complained of pain in her calf; she initially received no response. After insisting, the physician discovered that Ms. Sutherland had skin necrosis, which necessitated debridement, leaving Ms. Sutherland's lower leg disfigured. Ms. Sutherland sued, among others, the physician and the physician's office. The trial court refused to place the physician's office on the verdict slip although, after a jury verdict in favor of Ms. Sutherland, the trial court molded the verdict to hold the physician's office jointly liable. On appeal, the physician argued that the direct liability claim against the physician's office should have been submitted to the jury because the

office's employees had failed to pass messages regarding Ms. Sutherland on to the physician.

The *Sutherland* Court refused to "extend" *Thompson* "beyond hospitals to physician's offices" because, it determined, the policy considerations underlying the theory of corporate liability for hospitals were not present in the physician's office context. The court then stated that a physician's office, unlike a corporate hospital, had no "liability" to Ms. Sutherland (duty on the facts would have been a more precise formulation) because it had not "assumed the role of a comprehensive health center with responsibility for arranging and coordinating the total health care of its patients." *Id.* at 62 (quoting *Thompson*, 591 A.2d at 706).

Finally, in the 2009 *Hyrcza* decision, in addressing the direct liability of a professional medical corporation, the Superior Court again measured the role of the defendant in the total healthcare of the plaintiff. 978 A.2d at 981–84. The court stated that the relevant inquiry was whether the corporation's involvement in the plaintiff's "medical decisions was closer to that of a physician's office or to that of a hospital or an HMO." Then, the panel reviewed the evidence of record and concluded that the corporation "was a comprehensive health care provider with the 'responsibility for arranging and coordinating the total health care of its patients,' and was involved in daily decisions affecting its patients' medical care." As a result, the *Hyrcza* panel concluded, the professional medical corporation could be held liable under the theory of corporate negligence articulated in *Thompson*. *Id.* at 982–83. Ultimately, the Superior Court decided that the trial court did not err in sending the issue of corporate negligence to the jury, and that the record supported the jury's verdict in favor of the plaintiff.

We begin by noting that, on its face, the *Thompson* decision does not support appellants' narrow reading, which would limit the application of corporate negligence theory to hospitals. In *Thompson*, the Court recognized that a hospital has the nondelegable duty, owed directly to the patient, to ensure "the patient's safety and well-being" while at the hospital. The

Court went on to explain this duty by listing aspects of a hospital's responsibilities within four general categories. Notably, the *Thompson* majority did not purport to treat hospitals as *sui generis* corporate entities or to limit its decision to hospitals. To be sure, Justice Flaherty's dissent warned of what the dissent viewed as the dangerous consequences of a broad reading of the majority opinion which would recognize the same theory with respect to non-hospital entities. But, the dissent's warning merely posed the question; the dissent's view did not operate to narrow the theory; the majority did not engage that question (which was not before the Court); and the question of the logical parameters of the theory was left to legislative or case development. As it has happened, the subsequent decisional law in the lower courts, for the most part, has not taken up the banner of the dissent and has relied upon the reasoning in *Thompson* to support the proposition that medical corporations other than hospitals may owe duties directly to their patients.

Appellants suggest that, even absent express limitation, the *Thompson* decision spoke of a "hospital's" duty, which in itself indicated that corporate liability was a narrow cause of action available only against a hospital defendant. Appellants appear to rely on the familiar jurisprudential principle that decisions are to be read against their facts. But, appellants' application of the principle, much as their application of *Thompson,* is exceedingly literal, failing to account for the prudential considerations governing it, for how the principle dovetails with the concept of precedent at common law, or for how a recognition of corporate liability in other contexts itself squares with tort theory.

We have explained that this Court's decisions are read against the facts because "our decisional law generally develops incrementally, within the confines of the circumstances of cases as they come before the Court. For one thing, it is very difficult for courts to determine the range of factual circumstances to which a particular rule should apply in light of the often myriad possibilities." *Maloney v. Valley Medical Facilities, Inc.,* 603 Pa. 399, 984 A.2d 478, 489–90 (2009). De-

pending on the perspective of the Court, prospective or retrospective, this insight has separate but related implications. Prospectively, we endeavor to render determinations that "spring[ ] from the facts before us in th[e] appeal, while recognizing that our task is not simply to decide this case, but also to provide guidance upon the broader legal issue," especially where the issue is one of first impression. "By necessity, this undertaking requires breadth of vision and consideration of both sides of the coin: the facts of a given case on one side, and the law, which will almost always be more conceptual, on the other." *Thierfelder*, 52 A.3d at 1264 n. 9. On the other hand, recognizing the necessary narrowness of the individual decisional task and the limitations of imperfect foresight, we aspire to embrace precision and avoid "the possibility that words or phrases or sentences may be taken out of context and treated as doctrines." *Maloney*, 984 A.2d at 490 (quoting *Northwestern Nat'l Ins. Co. v. Maggio*, 976 F.2d 320, 323 (7th Cir.1992)).

In considering decisions retrospectively, when called upon to apply them, the law does not lose its precedential mantle based simply on formulaic reading; the intent of the principle that decisions are to be read against their facts is simply to prevent "wooden application of abstract principles to circumstances in which different considerations may pertain." *Maloney*, 984 A.2d at 485–86. Relevant here, a proper application of *Thompson* is not simply an inquiry into whether a nursing home is a hospital or like a hospital, as appellants would have it. The relevant question is whether the legal principles explicated in *Thompson*, or elsewhere in our decisional law, apply to describe appellants' legal duty or obligation to Ms. Scampone, given the considerations which pertain. Our examination has confirmed that the lower courts, in applying *Thompson*, have certainly sought to do this, although appellants' criticism regarding the cumbersome nature of the approach is well taken. The critical difficulty has been in employing an analysis focused primarily, and occasionally exclusively, on the question of whether the entity providing medical care had assumed the role of a comprehensive health

center responsible for arranging and coordinating the total healthcare of its patients. *See Thompson,* 591 A.2d at 706; *see, e.g., Shannon, Sutherland,* and *Hyrcza, supra.* This inquiry makes too much of the facts in *Thompson* and is of limited use in developing a principled analysis of relevant considerations and lacks the potential to serve as the governing principle upon which to recognize a legal duty or obligation with respect to other entities in the healthcare field. The proper inquiry is instead broader, under both *Thompson* and general, settled principles governing the legal recognition of a duty of care.[13]

In *Thompson,* the Court indeed spoke of the hospital's comprehensive role and its responsibility regarding the total healthcare of its patients. 591 A.2d at 706. The Court did so, however, primarily in the context of recounting the background that led to the abolition of hospitals' immunity in Pennsylvania. In the same context, the Court also noted that hospitals had "evolved into highly sophisticated corporations operating primarily on a fee-for-service basis." *Id.* These considerations, the Court explained, had played a role in the development of vicarious liability initially and then of direct liability against hospitals, following this Court's 1965 decision in *Flagiello. Id.* at 707 (citing *Tonsic* and *Capan, supra* ). While both factors regarding the hospital's role and its for-profit status received obvious consideration, they were not the critical concerns of the *Thompson* Court in articulating the defendant's duties of care.

The key to the Court's analysis was the relationship between hospital and patient—the parties, as in every case where the question of duty arises. *See Althaus,* 756 A.2d at 1169. The *Thompson* Court, of course, was writing in 1991

---

**13.** A collateral implication of appellants' main arguments is the suggestion that appellee may have waived arguments by citing primarily to *Thompson,* regarding recognition of appellants' duty of care independent of that decision. We reject the claim as incongruous with the jurisprudential principles developed above. *Thompson* is the decision that specifically addresses the direct liability of a corporation providing healthcare and citation to it by the Scampone estate in the complaint, throughout trial and on appeal, is appropriate for issue preservation purposes.

without the benefit of our later *Althaus* decision and, as a result, did not expressly engage in the five-prong analysis developed in the latter case. But, the Court's reliance on the principle articulated in Section 323 of the Restatement offered the functional equivalent of an *Althaus* factor analysis.

The Restatement, of course, is a synthesis of the common law which articulates the reasoned, mainstream, modern consensus. *See Phillips v. Cricket Lighters*, 576 Pa. 644, 841 A.2d 1000, 1012 (2003) (Saylor, J., concurring, joined by Castille and Eakin, JJ.). Section 323 has been part of Pennsylvania law for decades. *See Thompson*, 591 A.2d at 708 (citing 1984 decision in *Riddle*, 475 A.2d at 1316); *accord Hamil*, 392 A.2d at 1286 (in 1978, "Section 323(a) of the Restatement ... ha[d] been part of our Pennsylvania law of negligence for a dozen years"). The provision describes in general terms the duty of one to aid another as to whom one has undertaken to provide services, gratuitously or for consideration. In *Thompson*, the Court applied the general principle formulated in the Restatement to the circumstances pertinent—the hospital—patient relationship—and, in this sense, offered a "novel" theory of hospital liability. 591 A.2d at 708 (quoting and applying RESTATEMENT OF TORTS 2D § 323). The Court concluded that the hospital itself owed a non-delegable duty directly to the patient to ensure her safety and well-being while at the hospital. 591 A.2d at 707. Specifically, the hospital had obligations to observe, supervise, or control a patient's treatment approved by multiple physicians, and to apply and enforce its consultation and monitoring procedures. *Id.* at 705.

Appellants, of course, argue that the *Thompson* decision is inapposite here because there can be no proper analogy drawn between hospitals and nursing homes or related entities. Appellants claim that nursing homes do not offer comprehensive care or any medical services similar to a hospital. Moreover, appellants emphasize nursing homes' inability to control the actions of doctors on their premises, unlike hospitals. Even assuming, for the purposes of decision, that these representations are correct, appellants' exclusive focus on distinctions in

types and quantity of services provided by nursing homes versus hospitals is misdirected. While these distinctions may be relevant evidence to the trial court's ultimate determination of whether a duty exists, they do not fully anticipate the proper question that the trial court was required to decide in the first instance. The principal point is that evidentiary considerations should not be mistaken for the question of substantive duty. *See Gilbert*, 327 A.2d at 96–97 (correcting similar confusion regarding *res ipsa loquitur* doctrine, which was "conceived as a shorthand statement of the evidentiary rule allowing negligence to be established by circumstantial proof" but erroneously developed into heightened burden of proving duty of care).

As illustrated in *Thompson*, the proper question here is whether the Scampone estate offered sufficient evidence of the relationship with Highland Park, and separately with Grane Healthcare, to establish that duties of care exist, by application of Section 323 of the Restatement or by application of the *Althaus* factors. The inquiry is individual to each appellant, although the duties of appellants may be similar. This type of individualized inquiry into appellants' duties of care ensures that multiple entities are not exposed to liability for breach of the same non-delegable duties.

### V. Conclusion/Mandate

The question of a duty in tort is assigned to the trial court in the first instance. Here, the Rule 1925(a) opinion of the trial court suggests that the court decided the relevant duty of care questions on a basis akin to that suggested by appellants, *i.e.*, whether a nursing home's role in the total care of its residents is generally similar to that of a hospital. But, as we have explained, this inquiry does not capture the appropriate standard by which to decide whether a duty of care exists under *Thompson*. Employing the incorrect test generally affects how evidentiary proffers are received and the relative weight accorded to the relevant evidence. At this juncture, therefore, it is unfeasible to determine with any certainty either whether the requisite relationship exists between the

respective parties, or to articulate any specific duties owed by Highland Park or Grane Healthcare to residents like Ms. Scampone.

Accordingly, we affirm the Superior Court's decision to reverse the grant of a nonsuit with respect to Grane Healthcare and to affirm the denial of a nonsuit with respect to Highland Park, and remand this matter to the trial court for further proceedings. The trial court's initial task upon remand is to determine, consistent with this Opinion, whether the two appellants, Highland Park and Grane Healthcare, owed Ms. Scampone legal duties or obligations and to articulate any specific duties that it may find. Whether a trial is then to follow will depend upon the outcome of that inquiry.[14]

Jurisdiction relinquished.

Justice ORIE MELVIN did not participate in the decision of this case.

Justices SAYLOR, EAKIN, BAER, TODD, and McCAFFERY join the opinion.

14. In accordance with that part of the Superior Court's order which was not appealed, if the trial court finds a retrial to be appropriate, the Scampone estate may also re-assert any viable claims of punitive damages.