J-A27036-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JAMES COLEY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KEYSTONE TURF CLUB, INC., | : | |
| BENSALEM RACING ASSOCIATION, | : | |
| INC., GREENWOOD GAMING AND | : | No. 3837 EDA 2016 |
| ENTERTAINMENT, INC., D/B/A PARX | : | |
| CASINO, GREENWOOD RACING, | : | |
| INC., TURF CLUB SERVICES, INC., | : | |
| KEYSTONE PARK SERVICES CO., | : | |
| AND PARX CASINO DESIGN, INC. | : | |
| | : | |
| Appellants | : | |

Appeal from the Judgment Entered November 21, 2016
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 141201773

BEFORE: BOWES, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED MARCH 05, 2019**

Greenwood Racing, Inc. appeals from the judgment entered in favor of James Coley following a jury trial. Greenwood Racing argues the trial court erred in denying its motion for judgment notwithstanding the verdict ("JNOV") as to the award of punitive damages, the finding that Greenwood Racing owed a duty to, or breached any duty owed to, Coley, and the finding that any breach by Greenwood Racing caused harm to Coley. We affirm.

This case arises from an incident that occurred on July 31, 2014, at the Center City Turf Club ("Turf Club"). Turf Club patrons John Gleason, Sr. and John Gleason, Jr. verbally and physically assaulted Coley, also a patron.

Coley sued multiple corporate defendants for negligently failing to have proper or adequate security at the Turf Club, failing to come to his aid, failing to remove the Gleasons following an altercation they had with another patron, failing to monitor the Gleasons' activities in the Turf Club, and continuing to serve the Gleasons alcohol after they had become visibly intoxicated. The corporate defendants joined the Gleasons as additional defendants.

The case proceeded to a jury trial. At the close of Coley's case, the trial court dismissed the case as to the Gleasons.[1] Further, the corporate defendants filed a Motion for Nonsuit, which the trial court granted as to all entities except Keystone Turf Club, Inc. ("Keystone"), and Greenwood Racing.

The trial court set forth a summary of the testimony and evidence admitted at trial in its Pennsylvania Rule of Appellate Procedure 1925(a) opinion, which we adopt for purposes of this appeal. *See* Trial Court Opinion, filed June 29, 2018, at 6-20 ("1925(a) Op."). The following facts are some of the facts relevant to this appeal.

The deposition of Thomas Bonner, Greenwood Racing's corporate designee, was read into the record. Bonner testified that Keystone "ran, managed, and controlled the Center City Turf Club and, at the time of the July 2014 incident, Greenwood Racing[] was the sole shareholder of" Keystone. N.T., 8/5/16 (PM), at 64-65.

_____

[1] The motion for entry of voluntary nonsuit stated the Gleasons never responded to the joinder complaint; if called as witnesses, they likely would assert their privilege against self-incrimination; and they have not, and are not likely to, appear for trial.

- 2 -

Further, the Turf Club's General Manager Thomas Burke testified in a deposition, which was read to the jury, that Greenwood Racing was responsible for making security decisions at the Turf Club. Specifically, he stated his "superiors . . . Joe Wilson and Lance Merrell" made decisions "regarding security" at the Turf Club. N.T., 8/8/16 (AM), at 11-12. Joe Wilson was the chief operating officer ("COO") of Greenwood Racing. N.T, 8/5/16 (PM) at 63-64.[2] Burke further testified that "Joe Wilson [was his] only real superior that [he] answer[ed] to with regards" to the Turf Club. *Id.* at 55-56. Burke further testified the Turf Club had closed and that Wilson and another Greenwood Racing employee, Anthony Ricci, made the decision to close the Turf Club. *Id.* at 48-49. The jury further heard testimony that there were no security guards at the Turf Club on July 31, 2014, and that there had not been security guards for two years prior to that date. N.T., 8/2/16, at 232.

In addition, the jury heard testimony from Rus Kolins, an expert "in security issues with facilities such as the Turf Club." N.T., 8/4/16 (PM), at 11-12. Mr. Kolins testified regarding the cause of harm to Coley:

> The causation was the failure to enforce the policies of the Turf Club, to enforce the policies that they knew had to be in place for a reason, stop the threat, take these situations seriously, get rid of the people who were causing a problem here. They didn't do that. It was reckless. It was careless. It was negligent. And the bottom line was it le[]d to, seriously contributed to the event that caused the injuries to Mr. Coley."

N.T., 8/4/16 (PM), at 43-44.

---

[2] Lance Merrell was not identified.

- 3 -

At the time of the incident, there were 15 to 20 patrons at the Turf Club and four to five employees. N.T., 8/2/16, at 48, 140-42; N.T., 8/5/16 (AM), at 42. Mr. Kolins agreed that there was no law or ordinance that required the Turf Club to have security guards, and that the best practice guidelines state there should be a minimum of one security guard on a premises when there are 75 or more people present. N.T., 8/5/16 (AM), at 19-23.

However, Mr. Kolins also testified that the Turf Club was on notice that fights could happen on its premises because of prior incidents at the Turf Club, including at least three robberies, *id.* at 32, and fights in the establishment:

> Mr. Anglin testified about other fights, altercations in the club, and how the big manager ejected patrons who engaged in those fights in the club, which was the right thing to do, but there still were fights in the club. So that puts the Turf Club on notice that fights can happen. It's the type of place where fights—there's a heightened level and a heightened risk that fights can occur.

N.T., 8/4/16 (PM), at 33-34. He further testified about the emotions involved when people gamble and explained that the combination of alcohol and gambling creates a "heightened risk and a need for security." *Id.* at 35-36.

Mr. Kolins testified as to the deterrent effects of having uniformed security guards:

> Uniformed guards show[] a presence of authority. It's a deterrent to crime. Crime is committed by people who have an opportunity to commit the crime. When they have the opportunity and they have the ability to escape freely, they know that, hey, I can do something here and get away with it.

> . . .

> The benefit of uniformed guards is exactly what I am talking about here, having adequate security on premises. That encompasses having uniformed guard[s] and recognizable uniforms that are unique, that are telling patrons and people like the Gleasons, we have guards here, we're taking our security seriously, if you want to get involved in some shenanigans, we're going to address that issue with you. And if you behave badly, we're going to ask you to leave. So uniformed guards are a deterrent to crime, potential crime on the property.

***Id.*** at 28-29, 30.

At the close of plaintiff's evidence, Keystone and Greenwood Racing made a joint motion for a directed verdict, which the trial court denied. The trial court then submitted the case to the jury. The jury found in favor of Coley and against Keystone and Greenwood Racing on Coley's negligence claim and awarded $300,000 in compensatory damages.[3] It apportioned liability, finding each defendant 50% liable. The jury also awarded Coley $200,000 in punitive damages against Greenwood Racing, but did not award punitive damages against Keystone. Keystone did not file post-trial motions or an appeal, and has satisfied its portion of the judgment.

Greenwood Racing filed a post-trial motion for JNOV, arguing the evidence was insufficient as a matter of law to establish: Greenwood Racing breached a duty owed to Coley; Greenwood Racing's conduct was a cause of

---

[3] The jury found in favor of Keystone on the dram shop cause of action.

Coley's harm; or Greenwood Racing was liable for punitive damages. The trial court denied the motion.[4]

Greenwood Racing filed a timely notice of appeal, and raises the following issues:

> 1. Did the Trial Court err in denying Greenwood Racing, Inc.'s motion for JNOV where the evidence, viewed in the light most favorable to Plaintiff, was insufficient as a matter of law to submit the issue of punitive damages to the jury?
>
> 2. Did the trial court err in denying Greenwood Racing, Inc.'s motion for JNOV where the evidence, viewed in the light most favorable to Plaintiff, was insufficient as a matter of law to make out a claim that Greenwood Racing, Inc. owed or breached any duty owed to Plaintiff?
>
> 3. Did the Trial Court err in denying Greenwood Racing, Inc.'s motion for JNOV where the evidence, viewed in the light most favorable to Plaintiff, was insufficient as a matter of law for the jury to find that any alleged breach on the part of Greenwood Racing, Inc. was a legal cause of the harm to Plaintiff?

Greenwood Racing's Br. at 4 (suggested answers omitted).

Greenwood Racing's three issues challenge the denial of its motion for JNOV. We will reverse an order denying a motion for JNOV only if the "trial court abused its discretion or committed an error of law that controlled the outcome of the case." *Sears, Roebuck & Co. v. 69th Street Retail Mall, L.P.*, 126 A.3d 959, 967 (Pa.Super. 2015) (quoting *Thomas Jefferson Univ.*

---

[4] The trial court initially found the claims waived because Greenwood Racing failed to mention or identify any specific grounds in its post-verdict motion and because it believed Greenwood Racing's incorporation by reference of extraneous matters was improper. This Court disagreed, and required that the trial court issue an opinion addressing the merits, which the trial court subsequently filed.

*v. Wapner*, 903 A.2d 565, 569 (Pa.Super. 2006)). "Abuse of discretion occurs if the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias or [ill will]." *Id.* (quoting *Thomas Jefferson Univ.*, 903 A.3d at 569) (brackets in original). We "must view the evidence in the light most favorable to the verdict[-]winner and give him or her the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences." *Id.* (quoting *Thomas Jefferson Univ.*, 903 A.3d at 569). "[T]he grant of [JNOV] should only be entered in a clear case and any doubts must be resolved in favor of the verdict[-]winner." *Id.* (quoting *Thomas Jefferson Univ.*, 903 A.3d at 569) (some brackets in original).

Greenwood Racing first argues the evidence was insufficient to support a finding that it acted outrageously or with reckless indifference, and, therefore, insufficient to support an award of punitive damages. It argues almost all evidence related to the Turf Club, not Greenwood Racing, and is therefore irrelevant to whether punitive damages should be awarded against Greenwood Racing. It claims the only evidence related to Greenwood Racing was that the general manager of the Turf Club testified that Greenwood Racing's COO made decisions about security at the Turf Club. Greenwood claims there are no laws or ordinances that require security guards and that the best practices state that there should be a licensed and trained security guard when 75 or more patrons are present. It claims there was no evidence that Greenwood Racing knew of a need for security guards and therefore Coley

failed to establish the required state of mind to support an award of punitive damages.

The trial court set forth the relevant law on punitive damages and concluded Coley presented sufficient evidence that Greenwood Racing acted with reckless indifference to the interests of others such that the question of whether to award punitive damages properly was submitted to the jury and the jury award was supported by the evidence. 1925(a) Op. at 25. It noted that Coley presented evidence that Greenwood Racing, the sole shareholder of the Turf Club, made the security decisions for the Turf Club and, therefore, "[t]he jury could, and did, properly determine that [Greenwood Racing's] failure to ensure the enforcement of the Turf Club's well-established policies and the failure to have security guards on duty, exhibited reckless indifference to the interests of others and warranted the imposition of punitive damages." *Id.* at 26. After reviewing the trial court's opinion, the record, the parties' briefs, and relevant law, we see no abuse of discretion or error of law in denying Greenwood Racing's motion for JNOV for punitive damages. Accordingly, we affirm on the basis of the well-reasoned opinion of the Honorable Marlene F. Lachman, which we adopt and incorporate herein. *Id.* at 23-26.

In its last two issues, Greenwood Racing claims that it did not owe a duty to, or breach any duty owed to, Coley and that any breach of duty did not cause harm to Coley.

"[T]o state a cause of action for negligence, a plaintiff must allege facts which establish the breach of a legally recognized duty or obligation of the defendant that is causally connected to actual damages suffered by the plaintiff." **Scampone v. Highland Park Care Ctr., LLC**, 57 A.3d 582, 596 (Pa. 2012). To establish the duty and breach elements of negligence the plaintiff must establish "the defendant's act or omission fell below the standard of care and, therefore, increased the risk of harm to the plaintiff." **Id.** To establish a "causal connection between the breach of a duty of care and the harm alleged," the plaintiff must show "that the increased risk was a substantial factor in bringing about the resultant harm." **Id.** at 598. "[T]he necessary proximate cause will have been made out if the jury sees fit to find cause in fact." **Id.** (quoting **Hamil v. Bashline**, 392 A.2d 1280, 1288 (Pa. 1978)) (brackets in original).

Greenwood Racing argues the evidence was insufficient to support a claim that Greenwood Racing owed a duty to, or breached any duty owed to, Coley. It claims that the conduct of the Turf Club employees on the night of the incident was irrelevant when assessing the liability of Greenwood Racing. It argues the evidence as to notice related to the fact that the Turf Club employees did not act as they should have on the night in question, and that there was no evidence that Greenwood Racing had notice that security guards were needed. It claims there was no evidence as to the information the Turf Club provided to Greenwood Racing that would have alerted Greenwood Racing to security problems. As to the prior robberies and other fights and

altercations, Greenwood claims there "is simply no evidence of Greenwood Racing's knowledge of these incidents." Greenwood Racing's Br. at 37. It claims that any finding of liability against Greenwood Racing was improperly based on the corporate structure, as Greenwood Racing was Keystone's parent.

The trial court noted the testimony from Burke, regarding his supervisors from Greenwood Racing, and Bonner, regarding the relationship between Greenwood Racing and the Turf Club. The trial court found "[t]he jury could properly find that Greenwood was liable for inadequate security based on the fact that its COO was responsible for making decisions regarding security at the Turf Club." 1925(a) Op. at 20. We agree. Further, contrary to Greenwood Racing's arguments, the verdict was not based on its status as a parent corporation. Rather, it was based on evidence that Greenwood Racing was the entity in charge of security and that the lack of security fell below the standard of care and increased the risk of harm to Coley. The trial court did not err in denying the motion for JNOV as to duty and breach of that duty.

Greenwood next argues that the evidence was insufficient to support a finding that any breach by Greenwood Racing caused harm to Coley. It argues there was no evidence that the presence of security guards would have prevented the incident. It argues that the incident occurred in a short span of time and escalated quickly and that there were approximately 20 patrons and four to five employees present. It claims that "[p]rior to the beginning of the physical altercation, and during the verbal altercation, [Coley] had ample

opportunity to exit the Turf Club," and, prior to the beginning of the physical altercation, could have walked away. Greenwood Racing's Br. at 45. Further, it argues that Coley's security expert relied on testimony as to the Turf Club, not as to Greenwood Racing, to find causation. It argues that there was "no way to find that an alleged failure to have a security guard employed . . . was a factual cause of the altercation and [Coley's] injury." *Id.* at 48. It further argues that Greenwood Racing's decision to no longer employ security guards was "simply 'too remote' to impose liability on Greenwood Racing." *Id.*

We first address Greenwood Racing's claims regarding Coley's ability to walk away, and the shortness of the interaction. The trial court concluded that there was evidence that Coley could not have just walked away, as the machine had his money, and that "Greenwood [Racing's] focus on the shortness of the father's vicious attack on [Coley], ignores the son's confrontational events leading up to the father's physical attack." 1925(a) Op. at 21. The court noted other evidence showed that the Turf Club staff could have prevented the escalation by enforcing the policies and failed to do so. *Id.* The trial court thus found that the credibility of the witnesses was for the jury, as was the determination of whether the Turf Club employees could have intervened. *Id.* at 22. After reviewing the trial court's opinion, the record, the parties' briefs, and relevant law, we see no abuse of discretion or error of law. Accordingly, we affirm on the basis of the well-reasoned opinion of the trial court, which we adopt and incorporate herein. *Id.* at 20-23.

We next address Greenwood Racing's claim that there was no evidence that the presence of a security guard would have prevented the incident and that any decision regarding security guards was too remote. We conclude that this argument lacks merit. Mr. Kolins testified that the presence of security guards could have prevented the attack, and that Greenwood Racing was on notice for the need for security guards based on prior incidents and the nature of the establishment. The jury was entitled to credit this testimony. Accordingly, we conclude the trial court did not abuse its discretion or err as a matter of law in denying Greenwood's motion for JNOV as to causation.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/5/19

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| JAMES COLEY | : | DECEMBER TERM, 2014 |
| | : | |
| vs. | : | No. 1773 |
| | : | |
| KEYSTONE TURF CLUB, INC.; | : | |
| BENSALEM RACING ASSOCIATION, INC.; | : | |
| GREENWOOD GAMING AND ENTERTAIN- | : | |
| MENT, INC., d/b/a PARX CASINO; | : | |
| GREENWOOD RACING, INC.; | : | |
| TURF CLUB SERVICES, INC.; | : | |
| KEYSTONE PARK SERVICES CO.; and | : | |
| PARX CASINO DESIGN, INC. | : | |
| Defendants | : | |
| vs. | : | |
| | : | |
| JOHN GLEASON and JOHN GLEASON, | : | Superior Court Docket |
| FATHER and SON | : | No. 3837 EDA 2016 |
| Additional Defendants | : | |

## OPINION ON REMAND

Lachman, J.                                                                 June 29, 2018

### I. Procedural and factual background

In its original Pa.R.A.P. 1925 opinion, this court stated that the appeal should be
quashed because Appellant Greenwood Racing, Inc. had not properly preserved any
issues for review in its post-trial motion. On January 11, 2018, the Superior Court
remanded this case for the trial court to address the issues raised in that post-trial motion.
*Coley v. Keystone Turf Club, Inc.,* No. 3837 EDA 2016 (Pa. Super. Jan. 11, 2018).

On July 31, 2014, at approximately 9:30 p.m., Plaintiff James Coley was a
customer in the Turf Club, a business for off track betting located at 1635 Market Street
in Philadelphia. Plaintiff's Amended Complaint alleged that each of the corporate
defendants owned, possessed, maintained, controlled, and operated the Turf Club.

1

Coley Vs Keystone Turf Club, Inc. Etal-OPFLD

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b)  A. LEWANDOWSKI  06/29/2018

While Mr. Coley was at a betting machine, he was verbally threatened and physically beaten by additional defendants John Gleason Jr. and John Gleason Sr. The Plaintiff sustained injuries to his head, eye, leg, ankle, and foot. Before the altercation, John Gleason Jr. had been drinking and had threatened another patron.

Mr. Coley sued the corporate defendants for negligently failing to have proper or adequate security in the Turf Club, failing to come to his aid when he was attacked by the Gleasons, failing to remove John Gleason Jr. from the premises after his earlier altercation with a patron, failing to monitor John Gleason Jr.'s later activities in the Turf Club, and continuing to serve the Gleasons alcohol after they became visibly intoxicated. The corporate defendants joined John Gleason Jr. and John Gleason Sr. as additional defendants.

At the close of the Plaintiff's case, nonsuits were granted to additional defendants John Gleason Jr. and John Gleason Sr. The corporate defendants filed a joint written motion for a compulsory nonsuit. It was argued in the afternoon session of trial on Friday, August 5, and was decided during the morning session on Monday, August 8. The court dismissed all of the defendants except Greenwood and the Turf Club, and denied the substantive grounds for the motion in this written order:

> AND NOW, this 8th day of August, 2016, upon consideration of the Motion for Compulsory Non-Suit of Defendants Keystone Turf Club, Inc., Bensalem Racing Association, Inc., Greenwood Gaming & Entertainment, Inc. d/b/a Parx Casino, Greenwood Racing, Inc., Turf Club Services, Inc., Keystone Park Services Co., and Parx Casino Design Inc. ("the Turf Club") for compulsory non-suit pursuant to Pennsylvania Rules of Civil Procedure 230.1, and any response in opposition thereto, and argument of counsel, if any, it is hereby Ordered and Decreed that said Motion is Granted in part and Denied in part. All entities other than Keystone Turf Club, Inc. and Greenwood Racing, Inc., are dismissed with prejudice. See transcript.

2

Trial proceeded against Keystone Turf Club, Inc., and Greenwood Racing, Inc. Greenwood and the Turf Club made a joint oral motion for a directed verdict that was argued and decided during the afternoon session of August 8. NT 8/8/16 (PM) pp. 88-100. The court denied the motion for a directed verdict on the record on August 8, 2016. NT 8/8/16 (PM) p. 104.

The jury found in favor of the Plaintiff and against Keystone Turf Club and Greenwood Racing and awarded compensatory damages in the total amount of $300,000. Liability was apportioned 50 percent for each defendant. The jury separately awarded the Plaintiff $200,000 in punitive damages against Greenwood Racing only.

After the verdict, Greenwood filed a timely post-trial motion but Keystone Turf Club did not. The Turf Club is not a party to this appeal. The Turf Club has paid its portion of the verdict – $150,000 – and the judgment against it has been marked "Satisfied."

Greenwood's post-trial motion for judgment notwithstanding the verdict alleged that the evidence was insufficient as a matter of law to establish that Greenwood breached a duty to the Plaintiff, that Greenwood's conduct was a legal cause of Plaintiff's harm, and that Greenwood was liable for punitive damages to the Plaintiff. It stated:

> 1. The Trial Court erred and abused its discretion in denying Greenwood Racing, Inc.'s Motions for Compulsory Non-suit and for Directed Verdict, and should now grant JNOV in favor of [Greenwood], because the evidence taken as a whole, and viewed in the light most favorable to Plaintiff as verdict winner, was insufficient as a matter of law to make out a claim that [Greenwood] owed or breached any duty to Plaintiff. [Greenwood] incorporates herein by reference its Motions for Compulsory Nonsuit and for Directed Verdict, and the related briefing and argument.
>
> 2. The Court erred and abused its discretion in denying [Greenwood's] Motions for Compulsory Non-suit and for Directed Verdict, and should now grant JNOV in favor of [Greenwood], because the evidence taken as a whole, and viewed in the light most favorable to Plaintiff as

3

verdict winner, was insufficient as a matter of law for the jury to find that any alleged breach on the part of [Greenwood] (any such breach being denied) was a legal cause of the harm to Plaintiff. [Greenwood] incorporates herein by reference its Motions for Compulsory Nonsuit and for Directed Verdict, and the related briefing and argument.

3. The Court erred and abused its discretion in denying [Greenwood's] Motions for Compulsory Non-suit and for Directed Verdict, and should now grant JNOV in favor of [Greenwood], because the evidence taken as a whole, and viewed in the light most favorable to [Appellee] as verdict winner, was insufficient as a matter of law for a jury to hold [Greenwood] liable for punitive damages. [Greenwood] incorporates herein by reference its Motions for Compulsory Nonsuit and for Directed Verdict, and the related briefing and argument.

The trial court held that these issues were waived because Greenwood's failure to mention or identify any specific grounds for each issue violated Pa.R.C.P. 227.1(b)(2) ("post-trial relief may not be granted unless the grounds therefor ... are specified in the motion. ... Grounds not specified are deemed waived unless leave is granted upon cause shown to specify additional grounds."). The trial court also believed that incorporation by reference of extraneous matters was improper, especially when the incorporating party failed to attach copies of the documents it sought to incorporate.

The Superior Court disagreed with the trial court's waiver decision and held that "Greenwood's motion was sufficient to apprise the trial court of its arguments in support of JNOV." It therefore remanded for the trial court to prepare an opinion addressing the merits of Greenwood's arguments. *Coley,* slip op. at 7.

For the reasons that follow, the trial court properly denied Greenwood's motions for a compulsory nonsuit, a directed verdict, and judgment notwithstanding the verdict. This opinion will discuss together Greenwood's arguments for nonsuit, directed verdict, and post-trial relief because they are essentially all the same. Greenwood filed a written

4

motion for a nonsuit and orally argued it. It made an oral motion for a directed verdict and incorporated its arguments made during the argument on its nonsuit motion and in its written motion for a nonsuit, with further argument on those issues. NT 8/8/16 (PM) p. 88. The post-trial motion incorporated the argument for a nonsuit and for a directed verdict.[1]

## II. Standards of review

A trial court may enter a compulsory nonsuit on any and all causes of action if, at the close of the plaintiff's case against all defendants on liability, the court finds that the plaintiff has failed to establish a right to relief. Pa.R.C.P. No. 230.1(a), (c) .... Absent such finding, the trial court shall deny the application for a nonsuit. On appeal, entry of a compulsory nonsuit is affirmed only if no liability exists based on the relevant facts and circumstances, with appellant receiving "the benefit of every reasonable inference and resolving all evidentiary conflicts in [appellant's] favor." The compulsory nonsuit is otherwise properly removed and the matter remanded for a new trial.

*Scampone v. Highland Park Care Ctr., LLC*, 618 Pa. 363, 385–86, 57 A.3d 582, 595–96 (2012) (case citations omitted).

> In evaluating the trial court's grant of a nonsuit, "we must view the evidence adduced on behalf of the [plaintiff] as true, reading it in the light most favorable to [her]; giving [her] the benefit of every reasonable inference that a jury might derive from the evidence and resolving all doubts, if any, in [her] favor."

---

[1] The nonsuit and directed verdict motions raised four issues – failure to prove a dram shop claim against Keystone Turf Club, failure to prove any legal liability on the part of Greenwood, failure to prove causation, and failure to present sufficient evidence for punitive damages. Plaintiff's counsel agreed that the dram shop claim was against Keystone Turf Club only. NT 8/9/16 pp. 7-8. The jury found that Keystone Turf Club did not serve alcohol to the Gleasons while the Gleasons were visibly intoxicated, thereby finding in favor of Keystone Turf Club on the dram shop claim. Because a dram shop issue was not asserted against Greenwood, that issue is not addressed in this opinion.

Additionally, a compulsory nonsuit may be entered only in cases where it is clear that the plaintiff has not established a cause of action.... When so viewed, a non-suit is properly entered if the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action....

*Keffer v. Bob Nolan's Auto Serv., Inc.,* 59 A.3d 621, 631 (Pa. Super. 2012) (citations omitted).

"A directed verdict may be granted only where the facts are clear and there is no room for doubt. In deciding whether to grant a motion for a directed verdict, the trial court must consider the facts in the light most favorable to the nonmoving party and must accept as true all evidence which supports that party's contention and reject all adverse testimony." *Keffer,* 59 A.3d at 632 (citation omitted).

### III. Plaintiff presented sufficient evidence to take to the jury the issues of negligence, causation, and punitive damages.

### A. Evidence presented at trial.

### 1. Son's confrontation with Eddie

There were no security guards on duty at the Turf Club on July 31, 2014. NT 8/2/16 pp. 232. There had not been any security guards for two prior years. Id. pp. 233.

Oliver Anglin, a regular at the Turf Club since 1996, was present and observed the incidents that occurred on the evening of July 31, 2014. Mr. Anglin was a police officer for six years in Jamaica before coming to the United States 34 years ago. He now works for Caesar's Casino in Atlantic City and for a catering company in Philadelphia. NT 8/2/16 pp. 24-26.

Mr. Anglin's attention was drawn to the Gleasons who were sitting at the bar and were engaged in an "intense and loud" argument with an African American patron named

6

Eddie. NT 8/2/16 pp. 29, 35. The argument was "very loud and hostile" and had "racial overtones." It was louder than the normal sound of patrons cheering on their horses. Id. p. 40.[2]

When son Gleason grabbed a beer bottle and looked like he was going to hit Eddie with it, Eddie grabbed a chair. Id. pp. 34-35, 38-39. Mr. Anglin separated the men and then son Gleason "made a very racist comment." Id. pp. 36.

> A. ... Now, the conversation become to the point where they said, well, the young kid said to his old man, there's a whole bunch of niggers in here.
>
> * * * * *
>
> THE WITNESS: And they in the mood to hurt, you know. They start to use vulgar language.
>
> * * * * *
>
> A. Okay. The younger said to his dad, he said, well, there's a whole bunch of niggers in here. They don't like the way we behave, then we're going to fuck somebody and leave.

NT 8/2/16 pp. 42-43.

Two managers on duty that night were in positions to see the Gleasons' confrontation with Eddie and hear the racist remarks. 8/2/16 pp. 40, 52-53. Mr. Anglin tried, and failed, to get Greg Probst, the guest service manager, to eject the Gleasons. Mr. Probst merely spoke with them, let them stay, and then Mr. Probst left. Id. p. 43. After speaking to the Gleasons, Mr. Probst told Mr. Anglin that he was "going to watch and he's going to observe and if they continue misbehaving, they got to go." Id. 119. Mr. Probst

---

[2] Both additional defendants are named "John Gleason." Throughout the trial they were referred to as "father" and "son." Plaintiff is African American; the Gleasons are white. NT 8/2/16 pp. 29, 36. The clientele of the Turf Club is predominantly African American. Id. p. 213.

7

did not keep his promise because "they continued to be rowdy and disruptive. They were still in the place." Id. at 120.

The Gleasons continued to make racist comments and behave in a very agitated and loud manner. Id. p. 44.

> A. ... So for a second time I called the manager. I say you, I mean, you got to stop it. If this was one of my people, you would throw us all out.
>
> Q. Say again?
>
> A. I told him, if this was one of my people, you would throw us all out.
>
> Q. What did you mean by that?
>
> A. Okay. Well, in the Turf Club, I'm like let's say a liaison amongst my Jamaican community. There's a lot of Jamaicans frequent the Turf Club. It's a hangout. We're very, very fond of horse racing. Horse racing is a big part of our social culture. So a lot of Jamaican frequent the Turf Club.

NT 8/2/16 p. 45.

Mr. Anglin told Mr. Probst, "if it was my people behavior and the way this guy was behaving, they would throw us out. And the [sic] what was so special about these two guys that they were allowed to continue being disruptive and not only disruptive, but being basically racist. ... And he just walk away from me. He didn't give me an answer." NT 8/2/16 p. 121. Mr. Probst "basically walk away and ignore the fact." Id. pp. 46. Mr. Probst heard the racist language because "he was standing right there." Id. pp. 52-53. He "just turn away and walk back over to where he was sitting." Id. p. 55.

"At this point I [Mr. Anglin] called Mr. Probst by his name. It's about time you throw these guys out. I mean this is getting ridiculous. Who are these guys? Because they were just totally off cue. They were acting so hostile. So racist." NT 8/2/16 p. 54.

8

## 2. Failure to enforce Turf Club policies

Mr. Probst's failure to eject the Gleasons was contrary to established policies of the Center City Turf Club. Turf Club general manager Thomas Burke testified that "we don't tolerate" racial comments by the patrons. NT 8/5/16 (PM) p. 53.

Mr. Burke said it was significant that the Gleasons were not regular patrons of the Turf Club because strangers were supposed to receive added scrutiny.

> Well, in our club we have the same – I always say, the same 40 to 50 guys in our place every day. And then you have strangers come in, and that's okay. That's the nature of the business. You hope to get strangers. But we tend to when we see people that we're not familiar with, we tend to watch them for a little while until they are behaving in some sort of a respectable manner. We know our people so we watch the other people a little closer.

NT 8/5/16 (PM) pp. 52-53.

Turf Club general services manager Christopher Holst testified that if there was something close to an altercation, the company's policy was to immediately get involved. A manager would intervene and get the parties away from each other. If there were indications of possible trouble, and it continued at all, the manager would ask the persons involved to leave. If they didn't leave immediately when asked, the manager would call the police. NT 8/2/16 pp. 124-125.

Mr. Probst's failure to eject the Gleasons was also contrary to what Mr. Anglin had observed over the course of 20 years, as being the normal practice of the Turf Club. Mr. Anglin testified that the "general practice with management at the Turf Club if somebody should get intoxicated or somebody should get loud, they -- first they talk. And they continue then they escort them out the premises. And if they refuse to leave, they call the police. I see many times they call the police." NT 8/2/16 p. 28.

9

Plaintiff's expert, Russell Kolins, testified that the Turf Club's written workplace violence policy forbade patrons from engaging in threatening, intimidating, or harassing conduct and required employees to immediately notify a manager if such conduct occurs. He read these portions of the workplace policy to the jury:

> "Conduct that threatens, intimidates or coheresses [sic] another human resources member, a guest --," which would be a patron such as Mr. Coley, "-- or any other person is prohibited at all times, including during off-duty hours. This includes all acts of harassment including harassment based upon gender, race, age, and any other status protected by the law. Further, if you witness any behavior that might signal a potential for violence by another team member, guest, vendor, contractor or any other visitor to our property, we ask that you report it immediately to your supervisor or any other manager. Be as specific and detailed as possible. ...

> * * * * *

> "Your only obligation is to report the situation to a manager immediately." ...

> "Workplace violence is defined as any physical assault, threatening behavior or verbal abuse occurring within the work place or in any setting where a team member is performing company business." ...

> "The company considers the safety and security of our team members and guests as its top priority. Threats of violence or behavior indicating a potential for violence are taken seriously. It is vital for your safety that you immediately notify management of any potential threats against you, another team member, guest or visitor to our property."

8/4/16 (PM) pp. 18-19.

Mr. Kolins criticized Mr. Probst's failure to remove the Gleasons:

> He failed to monitor the threat. There was a serious threat that was not taken seriously. It was a father and son who should have been removed at the initial altercation, the initial threat. That was not done. And then later when he said I am going to monitor, that was false. He didn't do it. He didn't take any further action except go on about his business as a manager.

8/4/16 (PM) pp. 22-23.

### 3. Son's confrontation with the Plaintiff

After the confrontation involving Eddie, the situation was calm for about one hour and the Gleasons continued to be served drinks. Then the father went to the bathroom and the son "made a bee line" to a machine being played by the Plaintiff and stood behind him. NT 8/2/16 pp. 46, 47, 48. Although there were other machines available, the son told the Plaintiff that the son needed to play the machine the Plaintiff was using. Id. p. 49. Mr. Anglin testified that they began loudly screaming at each other, the Plaintiff "saying, I got my money in the machine" and "the kid [son] is saying I want to use that machine." Id. p. 57. They were so loud that everybody in the place could hear. Id.

The betting machine operates using a ticket purchased at the teller's window. The player's accumulated winnings are added to the amount of the ticket and redeemed at the teller's window. Plaintiff testified that he had won about $700 when the son came over and stood behind him. NT 8/2/16 pp. 169-170.

> So I went back to the machine, started placing some more bets. And then that's when I guess Gleason, Jr. came behind me, was making some very annoying like sounds like clapping, like somebody is impatient. He was just like making sounds while he was drinking his beer.
>
> And I turned around and I asked him, I said, hey, you all right? Yeah, yeah, yeah, yeah, I'm all right. I said, okay. I said, well, that race is about to go off. There's a couple more machines over there so you won't get shut out. Yeah? If I get shut out, I'll call my dad.
>
> That's when I looked at Joe, the teller, like what? I'm like we gave each other the eyes. I think something is wrong here.

NT 8/2/16 p. 170.

> So then I said, you know what? Let me try to get my money out of this machine and get to another one.

11

Before I knew it, that's when his father came over and got in my face. Now, I'm looking around in disbelief because this is happening like this. And I'm like shocked. I'm like what the? I just came down here to place bets and the next thing I know, I got two guys in my face. One is calling me all kind of names.

Q. What kind of names?

A. ... I'll fuck you up. Real angry and evil.

NT 8/1/16 pp. 172-173.

The Plaintiff looked at Joseph Domard, the teller, who was standing there looking at the Plaintiff and who heard the son's angry threats. "Joe, the teller. He was looking at my face. I'm looking at him like, come on. Somebody tell me something." Id. pp. 171, 173, 174. The teller did nothing.

The Turf Club staff had approximately five minutes in which to defuse the situation and to protect the Plaintiff. It was "a couple of minutes" between the times son first approached the Plaintiff until son threatened the Plaintiff with what son would do if he were shut out of the next race. NT 8/2/16 pp. 171, 237. It was an additional "three-plus minutes" between the times son started to threaten the Plaintiff until the time father broke Plaintiff's leg. NT 8/4/16 (PM) p. 26.

Turf Club teller Joseph Domard heard the earlier altercation involving Eddie, and heard and saw the altercation between the son and the Plaintiff. NT 8/2/16 pp. 236, 196. Afterwards, he told Turf Club Manager Christopher Holst that he thought the son was looking for an altercation by the way he came up behind the Plaintiff. Id. 129-130. He did not call a manager even after father began punching and kicking the Plaintiff and broke the Plaintiff's leg. Id. pp. 237-238, 240, 241-242.

12

### 4.  Failure to enforce Turf Club policies

Mr. Domard did not summon a manager despite knowing that he should call a manager if there was a hint of the start of an altercation, so that the manager could separate the parties. Id. p. 234. If there was any problem, his instructions were to immediately call a manager. Id. 236, 191. Turf Club manager Christopher Holst, who was on duty that night, agreed that Mr. Domard knew that he should page a manager if something like an altercation began. Mr. Holst testified that Mr. Domard never paged him regarding threats to the Plaintiff. Id., pp. 126-127.

Mr. Domard should have intervened or immediately called for a manager because "you would know that there is something going on that would have needed our attention," according to Thomas Burke. NT 8/5/16 (PM) p. 51. Mr. Burke was the Turf Club general manager for fifteen years. NT 8/5/16 (PM) p. 12. Mr. Burke testified that a Turf Club employee who sees something that may be a threat to a patron should intervene or at the very least immediately call a manager. NT 8/5/16 (PM) pp. 51, 53-55.

Mr. Kolins was very critical of Mr. Domard:

> his behavior was reckless. It was the continuing behavior of the employees of the Turf Club from Mr. Probst in the beginning in the first incident with Eddie, leading up to the incident with Mr. Coley. It was reckless. It was a reckless indifference to Mr. Coley. It was negligent. ... So it was wrong.

> This is absolutely wrong and a failure of the Turf Club to enforce its policy by training their employees and letting their employees know exactly what it is that they are supposed to do. They didn't have security. The employees were relied on after a security company had been dismissed some time prior to this incident. The employees were required to provide security.

* * * * *

> ... Mr. Domard knew what the policy was, but he didn't know how to do it. He didn't make a phone call. He had a telephone right beside him. He

13

didn't make a phone call to 911. Push a panic button. He had panic buttons where he worked. He didn't push a panic button. He had a telephone to call a manager, an intercom. He had an intercom. He didn't use the intercom. He did nothing.

8/4/16 (PM) pp. 25-26.

Mr. Kolins also criticized the Turf Club for relying on managers to provide security who were elsewhere in the building, and who never received training in security.

> The managers are not security guards. They're not security agents of any type. They're there to manage a business, as opposed to provide security. If they were hired as security, then they would have been dressed as [Page 31] security in a uniform or some type of unique uniform to say I am security here, as opposed to the manager who has other duties and can't be on the floor all the time because of the other duties he has. As a matter of fact, it was pointed out, he was in the kitchen.
>
> * * * * *
>
> They can't do it [provide security]. They can't do it because they can't be where they're supposed to be to monitor the activity on the floor, number one. Number two, they're not trained as security people, as I've said, and they're not trained to handle situations that could arise.
>
> Security-trained people are trained to handle situations where there may be violence, where there may be some sort of aggressive behavior. They're trained to handle that. As a matter of fact, I believe that the guards who were there before, Allied Barton, were armed. And so that adds an added layer or an added dimension of security and the presence of security on the premises saying, hey, we're here and we take it seriously.

8/4/16 (PM) pp. 30-31.

### 5.    Father's attack on the Plaintiff

Father, who was intoxicated, came rushing from the direction of the bathroom and son told him "oh, we got one," according to Mr. Anglin. NT 8/2/16 pp. 51-52. "And then Mr. Coley start talking. You know, he's telling them I'm using the machine and ... you know, he [the son] said to his dad, it's time to fuck up some niggers in here." Id. p. 52.

14

The father then savagely attacked the Plaintiff. Mr. Anglin attempted to intervene, but the son rushed him and pushed him back. At the same time, "the old man kept punching and kicking Mr. Coley." NT 8/2/16 pp. 55-56, 174. The attack was caught by a video surveillance camera and was shown to the jury. It shows the father stomping on the Plaintiff's leg and the resulting broken bone.

Mr. Anglin began "screaming at the manager, call the cop, call the cop. ... [T]he manager was right in front of me at this point. So I'm screaming to him, why don't you call the cop? Why don't somebody call the cop." NT 8/2/16 p. 57-58.

"When I noticed his [the Plaintiff's] shoes was pointing in one direction and his actual bone was on the floor, I'm screaming to the manager, call the cop. Call the cop. And he's on the floor and the old man is on top of him kicking him, punching him." NT 8/2/16 pp. 62-63.

"So eventually the kid, I think he grab his dad and they walked towards off to the left which is now like towards where the manager was standing right there. And I'm saying to him, you know, call the cop. Call the cop. He standing there looking at me. Nobody call the cop. So the guy was there. First they appear like they were going to run and they didn't run. They just gingerly walk towards the staircase, up the stairs and take off." 8/2/16 pp. 63-64.

Only after the Gleasons left did anyone call the police, and it was the cashier and not the manager. NT 8/2/16 p. 64.

Permitting the Gleasons to flee was contrary to what Mr. Anglin observed was the normal practice at the Turf Club. "In the past if there's an altercation and a fight they would lock the Turf Club and call the cops and no one would be able to leave. ... They

15

would lock the door. One of the managers go [sic] upstairs and lock the door so no one would leave." NT 8/2/16 pp 65-66.

### 6. Prior incidents, notice, need for security guards

Mr. Kolins testified that "prior to the assault on Mr. Coley, there were at least three robberies. There was a robbery of a Brinks truck, of Brinks guards." 8/4/16 (PM) p. 32.

> Prior incidents did occur. And despite the length of time that the robberies occurred, there were other incidents that occurred that had a propensity for violence.
>
> Mr. Anglin testified about other fights, altercations in the club, and how the big manager ejected patrons who engaged in those fights in the club, which was the right thing to do, but there still were fights in the club. So that puts the Turf Club on notice that fights can happen. It's the type of place where fights -- there's a heightened level and a heightened risk that fights can occur.

8/4/16 (PM) pp. 33-34.

> [T]he Turf Club was on notice because of prior fights and altercations that occurred in the club before July 31, 2014. And, further, was on specific notice at the time of the incident between the Gleasons and Eddie. That told the Turf Club management immediately that they've had a problem there, they have aggressors, they have a fight where somebody picks up, has to pick up a barstool to defend themselves. And a man who's got a beer bottle in his hand ready to use it to injure the man defending himself with a barstool.
>
> That's specific notice and was supposed to have been taken seriously by Mr. Probst but was not. The Gleasons were not removed from the club at that time. If they had been removed, we wouldn't be meeting today.

8/4/16 (PM) pp. 42-43.

Mr. Kolins testified that a "heightened risk" resulted from the very nature of the business at the Turf Club because it combined gambling and alcohol. The very high

16

elation caused by success and the equally low despair resulting from losses combine in a volatile mix. There are people who

> just won a lot of money. So now they're happy and they're expressing that. And people who are losing now resent that and react to that. So that creates potential problems.
>
> That becomes smoke -- talking about smoke. That's like the first incident that happened with Mr. Eddie and the Gleasons with the beer bottle. That was a smoke. The situation with Mr. Coley was the explosion. So where there's smoke, there's fire, but in this case it was an explosion. And that's what happened when you have gambling and a facility that also serves alcohol. And so you put those two combinations or that combination of elements, you have a heightened risk and a need for security, a need for the policy, which they had. There's no question about that. But what they didn't have is the training and the ability for the staff themselves to handle those problems.

8/4/16 (PM) pp. 35-36.

Mr. Kolins testified that the Turf Club "actually did not deal with security at all because they had nobody trained in security. They had a policy, but no training based on that policy to understand what that policy meant. So, therefore, they had no security whatsoever." 8/4/16 (PM) p. 17.

Mr. Kolins testified that the volatile nature of the Turf Club's business engendered a need for security guards. "There has to be trained security to handle this type of business. There has to be security." 8/4/16 (PM) pp. 35-36.

> Uniformed guards shows a presence of authority. It's a deterrent to crime. Crime is committed by people who have an opportunity to commit the crime. When they have the opportunity and they have the ability to escape freely, they know that, hey, I can do something here and get away with it.
>
>            \* \* \* \* \*
>
> ... The benefit of uniformed guards is exactly what I am talking about here, having adequate security on premises. That encompasses having uniformed guard and recognizable by uniforms that are unique, that are

17

telling patrons and people like the Gleasons, we have guards here, we're taking our security seriously, if you want to get involved in some shenanigans, we're going to address that issue with you. And if you behave badly, we're going to ask you to leave. So uniformed guards are a deterrent to crime, potential crime on the property.

8/4/16 (PM) pp. 28-29 & 30.

### 7. Causation

Mr. Kolins opined that the cause of Plaintiff's injuries was the Turf Club's failure to enforce its own rules by not ejecting the Gleasons after the incident with Eddie, and when son first confronted the Plaintiff.

> **A.** The causation was the failure to enforce the policies of the Turf Club, to enforce the policies that they knew had to be in place for a reason, stop the threat, take these situations seriously, get rid of the people who were causing a problem here. They didn't do that. It was reckless. It was careless. It was negligent. And the bottom line was it lead to, seriously contributed to the event that caused the injuries to Mr. Coley.
>
> **Q.** And what steps should they have taken that would have avoided this attack?
>
> **A.** Well, the very first step was to remove the Gleasons at the time of the incident when they were the aggressors against Eddie. That would have stopped the attack on Mr. Coley about 45 minutes to an hour later.
>
> The -- Mr. Anglin, in between the initial event and the attack on Mr. Coley, notified Mr. Probst again and said, Mr. Probst, these guys are acting up, if this were one of my people we would have been out of here a long time ago. And Mr. Probst still took no action other than to give lip service to Mr. Anglin saying, you know, I'll keep an eye on it, I'll monitor this.
>
> **Q.** How about Mr. Domard, how did his actions cause or contribute to this? ...
>
> **A.** And then at the time of the incident where son Gleason crowded and threatened Mr. Coley in front of Mr. Domard, Mr. Domard did nothing. He violated the policies of the Turf Club.
>
> The Turf Club did not enforce the policy at that time because Mr. Domard did not make a phone call, he did not push the panic button, he did

18

not use the intercom to get management and didn't call 911 and never said to Gleason, hey, buddy, I am here watching you, knock it off. He didn't get his attention that way. He didn't show him any authority, didn't say, hey, look, we're watching you.

And, by the way, watching what they were doing would have prevented the opportunity for them to believe that they could get away with something and then escape.

8/4/16 (PM) pp. 43-44.

## B. The evidence was sufficient to send to the jury the issue of Greenwood's liability for lack of adequate security

Greenwood argued that the only proper defendant was Keystone Turf Club Inc., because it leased the club premises, owned and operated the club, and allegedly controlled its day-to-day operations. Greenwood and the other defendants asserted that they did not have any duty to the Plaintiff and could not be subject to liability.

Turf Club general manager Thomas Burke, however, testified in a deposition read to the jury, that Greenwood Racing was responsible for making decisions regarding security at the Turf Club.

> MR. CHAIKEN: Finally, Your Honor, I'll read one more portion from the deposition of Mr. Burke, which deposition was taken March 28, 2016. Page 27, line 20.
>
> Question: All right. Who made decisions regarding security at the Center City Turf Club?
>
> Answer: That would be my superiors. It would have been Joe Wilson and Lance Morrell.

NT 8/8/16 (AM) pp. 11-12.

Mr. Burke testified that "Joe Wilson is my only real superior that I answer to with regards to Center City Turf Club." 8/5/16 (PM) pp. 55-56. Mr. Burke also testified that

19

his superior was Joe Wilson and that Mr. Wilson and Mr. Wilson's superior, Anthony Ricci, decided to close the Turf Club some time after this incident. NT 8/5/16 (PM) pp. 48-49.

Joseph Wilson has been the chief operating officer of Greenwood's racing division since 2007. NT 8/5/16 (PM) pp. 63-64. Lance Morrell was not identified.

There were no security guards on duty at the Turf Club on July 31, 2014. NT 8/2/16 p. 232. There had not been any security guards for two prior years. Id. pp. 233.

Plaintiff also read into the record portions of the deposition of Thomas Bonner, who was produced as the defendants' corporate designee. See NT 8/4/16 p. 47. He testified that the Keystone Turf Club, Inc., ran, managed, and controlled the Center City Turf Club. "At the time of the incident in 2014, Greenwood Racing, Inc., was the sole shareholder of Keystone Turf Club, Inc." NT 8/5/16 (PM) pp. 64-65.

The jury could properly find that Greenwood was liable for inadequate security based on the fact that its chief operating officer was responsible for making decisions regarding security at the Turf Club.

## C. Greenwood's nonsuit, directed verdict, and JNOV motions were properly denied

The argument on the nonsuit occurred in the afternoon of August 5, 2016. Greenwood's attorney also represented Keystone Turf Club and her principle focus was on the lack of sufficient evidence of visible intoxication to support Plaintiff's dram shop claim against Keystone Turf Club. NT 8/5/16 (PM) pp. 91-102. Her causation argument for Greenwood was based on the testimony of Plaintiff's security expert Mr. Kolins that the Plaintiff could have walked away when he was confronted by the Gleasons. Id., pp. 102-104. Greenwood's attorney argued:

20

He admitted that Mr. Coley could have stepped away. Therefore, was the fact that someone hadn't already intervened a proximate cause of the harm? We can't ask the jury to speculate about whether or not it could have made a difference. There has to be evidence from which they can find cause and [sic] fact and proximate cause.

And in light of the frame-by-frame review of how things progressed of the video, in light of the very short time frame, which Mr. Kolins admitted was 17 seconds, in light of the length of time that went by between any first incident after things completely calmed down and the later incident, and the fact that everyone involved was shocked and amazed at what happened, that this situation escalated as quickly as it did, whether or not there could have been by having someone intervene when the young man was standing, calling his father, when there was a trained police officer there who did try to intervene, how could anybody say that the claims of Mr. Kolins, if they were believed, was a cause of this harm?

We had a quick escalation. We had people intervening right away, the porter. There's no way for a jury to review these facts and say that anything that the Turf Club did or didn't do could have made a difference in this very compressed period of time, in this very quickly escalating situation.

NT 8/5/16 (PM) pp. 102-104.

The Plaintiff could not just "walk away" from the machine he was playing. The machine held his ticket with at least $700 in winnings and he was waiting for a Turf Club employee to assist him with the machine. NT 8/2/16 pp. 49-50, 169-170.

Greenwood's focus on the shortness of the father's vicious attack on the Plaintiff, ignores the son's confrontational events leading up to the father's physical attack. During that time, the Turf Club staff could have prevented the escalation of the incident into a physical attack by enforcing their well-established policy of removing, or at least separating, disruptive patrons.

The son's confrontation with the Plaintiff went on for many minutes *before* the father started to punch and kick the Plaintiff. NT 8/2/16 pp. 171, 237. The managers and other employees of the Turf Club were supposed to immediately intervene and defuse

21

the situation in those minutes before the violence started, according to the Club's well-established policy and practice. None of them did anything.

Greenwood ignores that it is the sole province of the jury to decide what the Turf Club employees could or could not have done in the time leading up to the attack upon the Plaintiff and during the attack itself. Having heard the testimony concerning the son's confrontation with the Plaintiff prior to the physical attack, and having viewed the video, this judge was not prepared to rule as a matter of law that the Turf Club employees could *not* have intervened on behalf of the Plaintiff. Therefore, the nonsuit was properly denied.

Furthermore, Greenwood's argument ignores that the Turf Club employees violated long-established Turf Club policies by not removing the Gleasons from the premises when they first confronted Eddie. That would have prevented the later attack upon the Plaintiff.

Greenwood's directed verdict argument on causation centered on the version of events presented in the testimony of defense witness Greg Probst, who was the Turf Club's guest service manager. The credibility of his testimony was an issue for the jury. *Borough of Nanty-Glo v. Am. Sur. Co. of New York,* 309 Pa. 236, 238, 163 A. 523, 524 (1932) (reversing directed verdict based on the uncontradicted testimony of the plaintiff's witnesses; "[h]owever clear and indisputable may be the proof when it depends upon oral testimony, it is nevertheless the province of the jury to decide"); *Moriens v. Albert Einstein Hosp.,* 363 Pa. Super. 557, 526 A.2d 1203 (1987) (the "Nanty-Glo Rule" requires that, when motions for directed verdicts are grounded on the testimony of witnesses who are uncontradicted or unimpeached, the issues must be submitted to the jury).

22

**D. There was sufficient evidence to submit the issue of punitive damages to the jury.**

The corporate defendants' written nonsuit motion argued against punitive damages generally, and did not focus on Greenwood individually. It did not posit any different or specific reasons why Greenwood should not be exposed to punitive damages, other than the general reasons common to all of the defendants.

Greenwood's nonsuit argument on punitive damages focused on the recklessness necessary for punitive damages. NT 8/5/16 (PM) pp. 104-107. It asserted that "the reckless indifference standard is one that the actor knows or has reason to know of facts which create a high degree of risk of physical harm and deliberately proceeds to act, a conscious disregard of or indifference to that act. That's the standard." Id., pp. 105-106. The court's reasons for finding that Plaintiff presented sufficient evidence to permit the issue of "reckless indifference to the interests of others" to be submitted to the jury are explained below.

The punitive damages argument in the Greenwood and Turf Club oral motion for a directed verdict was based on the testimony of Turf Club employees Messrs. Probst and Decker, which the defense claimed proved the reasonableness of the Turf Club's conduct. The credibility of their testimony, however, was for the jury. The credibility of Mr. Anglin was also a question for the jury, including his statements that he told the Turf Club managers about the Gleasons' behavior and racial comments and his statement that the managers saw and heard the racial comments made by the Gleasons.

Plaintiff's arguments against the motion for a directed verdict were well-taken:

In terms of the Greenwood Racing, the evidence in this case is that
they made the decision to have the managers of the club who they assigned

23

to other duties as well take care of security in the club and if you've got a situation where these managers are taken away from security, taken away from the possibility of protecting customers by the decisions of the Greenwood Racing to not have security guards, the jury could find that that is recklessly indifferent to the dangers if customers come in who represent a threat to other customers.

So I think that there is evidence here to satisfy punitive damages both against Mr. Probst being recklessly indifferent as well as the Greenwood Racing being recklessly indifferent because essentially they create a situation where there is or there can be no one available to provide security.

NT 8/8/16 pp. 97-98. The court agreed with those statements.

The standards governing punitive damages may be briefly stated as follows:

Punitive damages will lie only in cases of outrageous behavior, where defendant's egregious conduct shows either an evil motive or reckless indifference to the rights of others. Punitive damages are appropriate when an individual's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton, or reckless conduct.

Outrageous conduct is an "act done with a bad motive or with a reckless indifference to the interests of others." "Reckless indifference to the interests of others", or as it is sometimes referred to, "wanton misconduct", means that "the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow."

*Egan v. USI Mid-Atl., Inc.*, 92 A.3d 1, 18–19 (Pa. Super. 2014), *quoting Weston v. Northampton Personal Care, Inc.*, 62 A.3d 947, 961 (Pa. Super. 2013) (citations omitted).

The Plaintiff presented sufficient evidence to permit the issues of "reckless indifference to the interests of others" and punitive damages to be submitted to the jury. The Gleasons engaged in racially-charged disruptive and threatening conduct with

24

another patron (Eddie) before their attack on the Plaintiff, and were permitted to remain on the premises contrary to well-established policy and practice.

Later, the son approached the Plaintiff and when the Plaintiff would not surrender the machine he was playing to the son, the son began screaming at him. The manager of the club refused to do anything about the situation, contrary to well-established policy and practice. The father then savagely attacked the Plaintiff, punching and kicking him, and stomping on his leg, breaking the bone which protruded from his pants.

The manager saw and heard what was happening but still did nothing. An eyewitness to the attack constantly implored the manager to call the police, but the manager did not. Only after the Gleasons had fled did the cashier – not the manager- call the police.

There were no security guards on duty at the Turf Club on July 31, 2014. NT 8/2/16 pp. 232. There had not been any security guards at the Turf Club for the two prior years. Id. pp. 233.

The court properly denied the nonsuit and directed verdict motions, and allowed the issue of "reckless indifference to the interests of others" to be submitted to the jury. Throughout the evening's events the management of the Turf Club acted in an unreasonable character by disregarding their own policies regarding ejectment of disruptive patrons. Before their attack on the Plaintiff, the Gleasons threatened another African American patron with a beer bottle and made racist comments. They continued to make racist comments after that event subsided and they continued to be served drinks. Based on the Gleasons' earlier racist epithets and threat of physical attack, the risk of violence was so great as to make it highly probable that harm would follow.

25

Joe Wilson, the chief operating officer of Greenwood's racing division was responsible for security at the Center City Turf Club. NT 8/8/16 (AM) pp. 11-12, NT 8/5/16 (PM) pp. 63-64. The jury could, and did, properly determine that his failure to ensure the enforcement of the Turf Club's well-established policies and the failure to have security guards on duty, exhibited reckless indifference to the interests of others and warranted the imposition of punitive damages.

## IV. Conclusion

For the foregoing reasons, the Superior Court should affirm the judgment on the jury's verdict in favor of Plaintiff James Coley and against Defendants Greenwood Racing, Inc., and Keystone Turf Club, Inc.

**BY THE COURT:**

_____

LACHMAN, J.

26